## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.  08-CV-02635 WYD-MJW

---

JOSEPH M. KASHAWNY,

     Plaintiff,

v.

XCEL ENERGY SERVICES, INC. a Minnesota Corporation;
CAMILLE ABBOUD; JACK DYBALSKI; and
CARY OSWALD,

     Defendants.

---

## AMENDED COMPLAINT
---

COMES NOW the Plaintiff, Joseph Kashawny, by and through his counsel, McNamara, Roseman, Martinez & Kazmierski LLP, and for his Complaint against the above-named Defendant, alleges as follows:

## JURISDICTION AND VENUE

1.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.  This action is authorized and instituted pursuant to 42 U.S.C. § 2000 *et seq*. and 42 U.S.C. § 1981.

2.    The acts complained of herein were committed, or had their principal effect, within the District of Colorado, and therefore, venue is proper within this District pursuant to 28 U.S.C. § 1391.

1

**EXHIBIT A**

## PARTIES

1.      Plaintiff Joseph Kashawny ("Kashawny") is a citizen of the United States, and a resident of and domiciled in the State of Colorado.  At all times relevant to the allegations in this Complaint, Kashawny was employed by Xcel Energy.

**2.**      Defendant Xcel Energy Services, Inc. ("Xcel") is an employer within the meanings set forth in applicable federal law, and was, at all times relevant to allegations in this Complaint, Kashawny's  employer.  Xcel is a utility supplier of electrical and natural gas services operating in Colorado and several other states and a wholly-owned subsidiary of Xcel Energy, Inc..

## ADMINISTRATIVE PREREQUISITES

**3.**      Kashawny filed a charge of national origin, sex, religious discrimination and retaliation with the Equal Employment Opportunity Commission, Charge No. 541-2008-00938 on or about January 29, 2008 and a subsequent charge of religious, national origin discrimination and retaliation on or about June 10, 2008, with the Equal Employment Opportunity Commission. Kashawny received a Notice of Right to Sue regarding those charges from the EEOC on or about October 7, 2008.  Kashawny's Complaint is timely filed in accordance with the Notice of Right to Sue.

## FACTUAL ALLEGATIONS

4.      Kashawny repeats and realleges all previous paragraphs of his Complaint as though fully incorporated herein.

5.      Kashawny is an Arab-American of Moroccan descent.  He is a Muslim and is fluent in English, Arabic and French.

6.     In addition to lesser degrees, Kashawny has earned Masters degrees in International Management and Business Administration with a concentration in finance. Kashawny possesses a Master's degree of International Management and an MBA in Finance. He has approximately 25 years of experience in providing quantitative and qualitative analysis in such areas of economic analysis, financial risk assessment, assessing the market potential of new business ventures, modeling financial instruments and derivatives and analysis of transmission and pipeline capacity.

7.     Kashawny commenced his employment with Northern States Power on June 21, 1999 as a financial engineer, and moved to the position of Director, Market Pricing during the merger between Northern States Power and Public Service Company of Colorado, which resulted in the creation of Xcel Energy in 2000.

8.     Throughout the course of his career, Kashawny has been consistently been an above average performer at Xcel, and until 2002, his employment proceeded without serious incident.

9.     In the fall of 2002, Kashawny attended a company dinner to recognize those who had been participating in a due diligence review, organized by a Human Resource Director of Xcel.  A number of key executives with Xcel were present at the dinner, during the course of which a co-employee of Kashawny, made numerous statements in front of a number of Xcel executives which were offensive and discriminatory, including comments along the lines of "I hate you immigrants", "I hate illegal immigrants", "I hate the French", and "I hate the Arabs".

10.     Kashawny found these comments highly insulting and was astonished that with the exception of one individual at the dinner, no executives of Xcel sought to intercede or

11.     A few months later, when it became apparent that this individual was being considered for another promotion to Vice President of Trading, Kashawny discussed his concerns with Human Resources and also became aware that several other Xcel employees had complained to Human Resources and to the President of Commercial Enterprises, a subsidiary of Xcel.

12.     Astonishingly, despite these complaints by Kashawny and co-workers, this individual was rewarded with two promotions within a few months after his offensive, distasteful, and discriminatory comments.

13.     At that point, Kashawny concluded there was simply no utility in complaining any further to Human Resources about those actions, or indeed, subsequent discriminatory actions.

14.     Since approximately the fall of 2002, and continuing through early January of 2008, Kashawny has been subject to an unremittingly hostile work environment in which he has been subjected to odious and discriminatory comments and treatment on a regular basis.

15.     For instance, since the fall of 2002, and continuing into early January 2008, Kashawny has repeatedly been called offensive and derogatory racial, ethnic and religious slurs by three executives of Xcel, Jack Dybalski, Camille Abboud and Cary Oswald, including, but not limited to:

- "Goat herder"

- "Camel Jockey"

- "Sand Nigger"

- "Moroccan Terrorist"

- "Dirty Arab"

- "Rag Head"

- On numerous occasions management personnel have shouted out "Praise Allah" or "Allah Akubar" near or in front of Kashawny

- On occasion, management has compared Kashawny's physical characteristics of those of the President of Iran.

- Kashawny has been humiliated by senior management suggesting that sand and dirt in his office which fell off of the table during a office move "must have reminded him of his home country".

- On numerous occasions senior management personnel have made disparaging comments about Kashawny's Arabic's looks, how he dresses, and "his foreign accent".

16.     On a number of occasions, Kashawny indicated these comments were unwelcome and offensive to him, to his immediate supervisor, Mr. Abboud, Mr. Oswald, as well as to his second line supervisor, Mr. Dybalski.  However, the barrage of outrageous comments and conduct continued on a weekly and often on a daily basis.

17.     Despite the fact that Kashawny complained directly to his superiors, Mr. Abboud, Mr. Oswald, and Mr. Dybalski, the conduct continued.  Mr. Abboud is a Lebanese Maronite Christian.

18.     These events occurred frequently during company meetings on premises, as well as privately with senior management officers in Kashawny's office.  On occasion, this outrageous conduct occurred outside the office and at off-site company sponsored events.  On a

number of occasions, Kashawny would return to his office and shut the door and cry, humiliated by the offensive and discriminatory treatment.

19. Kashawny hesitated to go any further then complaining to his direct senior management, including Mssrs. Dybalski, Abboud, and Oswald, since he had seen his prior complaints about another executive had generated no meaningful response from Human Resources.

20. Kashawny's Moroccan background and upbringing taught him to respect authority and that it was unmanly to complain about mistreatments – given that he had already complained to senior management he wished to do nothing further which could jeopardize his career.

21. Not only was Kashawny submitted to an unceasing barrage of offensive racial and national origin episodes, but he was sexually harassed as well.

22. On a number of occasions, Mr. Oswald slapped him, touched Kashawny's posterior, grabbed him, put his hands on Kashawny's legs and made suggestive sexual advances to Kashawny. Mr. Oswald is an openly homosexual male.

23. Frustrated by this pattern of misconduct, Kashawny complained not only to Mr. Oswald but also to Mr. Dybalski. His complaints were met by laughter and sexual gestures from Dybalski, who laughingly indicated that Kashawny and Mr. Oswald were engaged in sexual intercourse.

24. Despite an extremely hostile work environment, Kashawny continued to perform capably earned the admiration of his peers and management with regard to his work performance. Kashawny was consistently rated as "meets expectations" or higher.

25.     In December of 2007, Kashawny, once again demonstrating his devotion to Xcel, canceled his holiday vacation so certain work related to a particular project could be completed on time.  Rather than the well deserved pat on the back for such extraordinary effort, he was rewarded with a meeting on approximately January 3, 2008 with Dybalski.

26.     Astonishingly, Dybalski wished to quiz him about a matter of Kashawny purchasing a monitor for his computer.  Apparently, Kashawny's immediate supervisor, Abboud, had indicated Kashawny had purchased the monitor without his permission.  Not surprisingly, Kashawny was dumb struck, since as Director of Risk, he believed it was not necessary for him to secure the approval of his supervisor for the purchase of a $350 monitor.  Moreover, Abboud had previously approved such a purchase in the fall of 2007.

27.     During the course of the meeting, Kashawny indicated to Dybalski that Abboud, Oswald and Dybalski needed to cease the barrage of insults and harassment.  Kashawny pleaded with Dybalski to stop the conduct and further indicated he loved his job and career at Xcel and that he did not intend to resign, if that was what the conduct was intended to insure.  Dybalski's response to Kashawny's entreaties was that he "didn't intend to do anything about it" and that Kashawny's choices were to "accept it or leave".

28.     Kashawny was astonished and frustrated.  He pointed out to Dybalski that he had on many occasions, when the work warranted, stayed overnight and worked for more than 30 hours nonstop.  Kashawny noted he was typically in the office hours before anyone else, including Dybalski.

29.     Kashawny ultimately left Dybalski's office and returned to his own, stymied, frustrated and shocked by the turn of events.  At that time, neither Abboud nor Oswald had even appeared for work.

30.     The next day Dybalski came into Kashawny's office, and indicated he wished to meet with Kashawny and a Human Resources representative, Patrice Miller.  Kashawny summarized his discussion with Dybalski to Ms. Miller in some detail.  Astonishingly, Dybalski then made the statement that Kashawny had "threatened to take the company down" which Kashawny completely denied.

31.     Kashawny was shocked and perturbed by this turn of events, since he assumed the purpose of the meeting was for Human Resources to conduct an investigation into the allegations Kashawny had raised regarding his discriminatory and offensive treatment.  Now, however, it appeared that he was under investigation, not Dybalski, nor Abboud or Oswald.

32.     Kashawny was stunned when he was informed that he was being suspended immediately but that he would be permitted to return to work at the latest by Monday, January 7, 2008.  Neither Dybalski, Abboud nor Oswald were similarly suspended, despite Kashawny's complaints about the discriminatory comments and treatment which had been meted out to him.  Kashawny was then asked for his employee badge and humiliatingly escorted out of the building.  He was assured he would be "back shortly" and that there was no need to take his personal belongings from his office.  This was the first time in Kashawny's career at Xcel that he had ever been disciplined.

33.     On January 7, 2008, Kashawny met with Miller in her office.  Miller indicated she was now tasked with an investigation of the issues raised by Kashawny.  Kashawny then asked Miller to explain what was happening and why, since he had been told he would be removed from suspension on January 7, 2008, but had now found out that he had been removed from his computer's Outlook file and his office phone was no longer working.

34.     Miller indicated she was unaware of those circumstances but that she would "investigate further".   There was then additional discussion about the purported comment Kashawny had made about "taking the company down".

35.     Miller asked for further examples of the hostile work environment and discriminatory treatment which Kashawny had been subjected to.   He gave her additional details about many of the instances, although his discussion was not a complete recitation of every single comment or behavior to which he had been subjected.   Kashawny further discussed with Miller the allegations of sexual harassment concerning Oswald.

36.     Finally, Kashawny discussed with Miller incidents and behavior which Kashawny suspected were either highly inappropriate or possibly unlawful, including frequent trips and expense reports which were a waste of Xcel's money and resources for personal use and possibly in violation of Public Utility Commission Regulations.   Miller indicated she would be investigating the circumstances.   Among the circumstances which Kashawny raised were Abboud bringing in pictures of naked women on the company phone to share with the management group at regularly scheduled meetings, using a company credit card to buy drinks in saloons and bars for personal acquaintances potentially using Xcel's expense account for personal trips, and using company funded events and travel for personal use.

37.     Kashawny continued on suspension until a meeting on January 10, 2008 with Ms. Chris Cocchiarella, another Human Resource officer.   Cocchiarella explained that she would be focusing on the expense and transactional issues raised by Kashawny and Miller would focus on the discrimination issues.

38.     Kashawny indicated that he was uncomfortable merely reporting his concerns to Human Resources and that he would prefer to present such a report further up the management

39.     Kashawny indicated that while he had concerns about improper charges and conduct, he obviously did not have the ability to conduct his own investigation.  That being the case, Kashawny gave Cocchiarella at least four examples which were items of substantial concerns to him, including but not limited his concerns with the MHEB Exclusive Agreement with Xcel and its possible detrimental impact on the rate paying public, Dybalski's frequent comments that he "doesn't give a damn about rate payers," meaning the general public, Dybalski's comments that "I shit on the rate payers" and Dybalski's suggestions that emails which might be unflattering or unfavorable to Xcel should be destroyed.   Additionally, Kashawny indicated on numerous occasions he has been asked to change Xcel's numbers by Abboud, but had refused to do so.  Kashawny also indicated that he had been told by Dybalski that Kashawny should give Abboud whatever he wanted with regard to changed numbers. Kashawny was concerned that a number of transactions were inappropriately passing expenses on to the rate payers in possible violation of PUC regulations.

40.     Kashawny also informed Cocchiarella about his concerns about various tasks carried out by Oswald's group for fuel purchasing and options which were created by that group, even though Risk Management was not permitted conduct to any such trading, as well as other issues.

41.     Any or all of this conduct could be violative of PUC regulations.

42.     Kashawny continued on suspension for more than a month until he next heard from Miller on February 15, 2008.  Astonishingly, during the same period of time, none of the

individuals who had been accused by Kashawny of creating a hostile work environment and participating in the vilest of racial and ethnic slurs, had been suspended or disciplined in any manner.

43.     On February 15, 2008, Kashawny was informed by Miller that the charges had been partially substantiated and that "corrective actions would be taken".  When Kashawny responded with some relief and inquired as to when he could return to work, he was informed that he would have to ultimately meet with Cocchiarella and Miller to determine that.  Upon information and belief, at least two other Xcel executives had confirmed that derogatory and offensive comments had been made to Kashawny on a regular basis.

44.     Kashawny was invited to a meeting on February 25, 2008 with Cocchiarella in Miller's office.  Cocchiarella also indicated that Miller had completed her investigation (on the discrimination/hostile work environment allegations) and the charges were "substantiated in part" and that "corrective actions would be taken".  Kashawny was also informed that he was required to report to work on February 26, 2008 at 2 p.m. to meet with Cocchiarella and Abboud so that a *disciplinary letter could be read to him before he reported back to work full time on February 27, 2008.*

45.     Kashawny was incredulous.  He simply could not understand why a disciplinary letter would be issued against him for the first time in his career at Xcel.

46.     Cocchiarella responded angrily that the decision had been made and refused to give him any details.  Kashawny inquired as to whether his allegations concerning questionable expenses had been investigated.  Cocchiarella once again responded in a harsh tone that the expenses were authorized.  When Kashawny suggested that an investigation should compare

Abboud's expenses to other individuals, Cocchiarella raised her voice again, indicating that was none of Kashawny's business.

47.     At this point, Kashawny became concerned that there had not been a viable investigation of the claims he had made with regard to the potentially improper conduct by Abboud and the possible pass through of unverified personal expenses to the public and consumers, as well as other issues that had raised.  When he suggested that the PUC might be the more appropriate arbiter of whether the expenses were legitimate, Cocchiarella literally jumped from her chair as if she was going to strike Kashawny.  Then, Cocchiarella stopped, composed herself and indicated she would continue her investigation.

48.     On February 26, 2008, Kashawny met Cocchiarella in the Xcel lobby where he asked if she had a few minutes to talk before his scheduled meeting with Abboud.  The two of them went to Miller's office where there was a further discussion.  Kashawny inquired as to how he is to interact with Abboud when he had continually called him offensive names, discriminated against him, created a hostile work environment and was a party to the charges of improper conduct which had been brought to the attention of the company by Kashawny.

49.     Kashawny indicated he believed Human Resources should give him written direction on how to proceed since without such written procedures, there was room for misunderstanding as to how a reporting relationship was to continue.

50.     At this point, Cocchiarella lost her temper, raised her voice and pointed her finger at Kashawny, indicating that Abboud was his superior and that Abboud would do whatever he pleased with Kashawny as his employee.  At that time, Cocchiarella raised a suggestion that "all of this could be avoided" if he would simply sign a release in return for some severance compensation.

51.     Kashawny was shocked and deeply disappointed by Human Resources' suggestion.  He had come to Human Resources in good faith to report intolerable and offensive conduct on behalf of senior management only to be disciplined himself.  Now it was being emphatically suggested that he might be better off resigning from the company in return for some monetary consideration.  Kashawny had devoted almost nine years of his life to Xcel and had no intention of leaving voluntarily.

52.     Cocchiarella again lost her temper and ordered Kashawny into the meeting with Abboud which occurred immediately thereafter.

53.     During the course of the meeting, Abboud, the perpetrator and co-creator of a disgustingly hostile work environment, read with great relish a "Written Reminder of Conduct" which was presented to Kashawny.  Kashawny's patience reached its breaking point and he simply responded "This is bull" and further queried how it could be determined that Kashawny said something inappropriate such as "I will take the company down" when it was simply not true and anyone claiming that was making it up.

54.     On February 28, 2008, Kashawny had a meeting with Valerie Vasquez of Human Resources.  She commenced the meeting by indicating that she knew this was "not fun" and further asked of Kashawny if he was "taping this investigation".  Kashawny responded that he was not.

55.     Kashawny indicated he wished to file retaliation charges against Dybalski, Abboud and Cocchiarella for his discipline.  Vasquez informed him that he could do so at the end of the meeting.  Vasquez inquired as to whether Kashawny had recorded conversations relating to the investigation of the charges that he had brought to the attention of the company.  Kashawny indicated that he had documented all of his meetings but had not tape recorded any of

the conversations between himself and Human Resource representatives or Messrs. Dybalski, Abboud or Oswald.

56.     Kashawny then inquired as to how he could file his retaliation charges and was given a blank piece of paper by Vasquez on which he could indicate his desire to do so.  Vasquez mentioned she didn't know who would be investigating any retaliation charge but had Kashawny sign the paper after which Kashawny left the office.

57.     Kashawny returned to work on March 3, 2008 and was in the Xcel lobby awaiting his employee badge when Kashawny was summarily called into a meeting with Dybalski and another Human Resource representative, Daniel Roybal and was abruptly informed he was being terminated.   The purported reason for the termination was that on February 26, 2008, Kashawny's conduct during and following his disciplinary meeting at which, *for the first time during the course of his nine years of employment at Xcel*, he was disciplined, was "inappropriate and unprofessional".   The termination letter was, incredibly, signed by Dybalski, one of the very individuals who had continually subjected Kashawny to a hostile work environment and had discriminated against him on a number of occasions.

58.     Additionally, the letter purported to terminate Kashawny because he had "tape recorded conversations between yourself and company employees relating to confidential investigations".  This was a complete falsehood.  In fact, Kashawny *had not* tape recorded conversations pertaining to the investigation which occurred at the work place or during working hours.  Xcel's own policy only prohibits employees from recording conversations *in the work place* for personal use.

59.     The termination of Kashawny was specifically *not* performance based.  His termination was discriminatory and in retaliation for his having asserted numerous claims of discrimination and improper conduct against key executives of Xcel.

60.     Kashawny has suffered substantial economic loss, including lost annual compensation well into the six figures, substantial additional bonus compensation, stock options, and a variety of additional benefits including a 401K Plan, health insurance, vacation pay, holiday pay, pension and other meaningful employee benefits.

61.     Additionally, Kashawny has suffered substantial emotional distress as a result of the hostile work environment and discrimination to which he was subjected to during the course of his employment, as well as additional emotional distress as a result of his discriminatory and retaliatory termination from employment.

## STATEMENT OF CLAIMS

### FIRST CLAIM FOR RELIEF – XCEL

(National Origin/Religious Discrimination and Hostile Work Environment in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e) *et seq.*)

62.     Kashawny repeats and realleges all previous paragraphs of his Complaint as though fully incorporated herein.

63.     Xcel maintained a hostile work environment that was pervasive and severe.

64.     Xcel maintained an environment that discriminated against Kashawny on the basis of his national origin and religion.

65.     Kashawny was subjected to a pervasive and severe hostile work environment because of his religion and national origin.

66.     The hostile work environment to which Kashawny was subjected to adversely affected the terms and conditions of his employment with Xcel.

67.     Xcel's conduct in maintaining and condoning a hostile work environment on the basis of Kashawny's national origin and religion was an unlawful employment practice and in violation of Title VII.

68.     The effect of Xcel's unlawful employment practice has been to deprive Kashawny of equal employment opportunities and otherwise adversely affect his status as an employee.

69.     Xcel's unlawful employment practice was intentional.

70.     Xcel's conduct was willful and wanton and was performed with reckless disregard to Kashawny's protected rights against discrimination under Title VII.

71.     As a result of Xcel's unlawful and intentional conduct, Kashawny has suffered both economic and non-economic losses and injuries.  Kashawny prays for relief from his injuries and losses as more fully set forth below.

## SECOND CLAIM FOR RELIEF – XCEL

(Retaliation under Title VII of the Civil Rights Act, 42 U.S.C. § 2000(e) *et seq.*,)

72.     Kashawny repeats and realleges all previous paragraphs of his Complaint as though fully incorporated herein.

73.     Kashawny engaged in protected activity by reporting his allegations of hostile work environment and religious and national origin discrimination as well as sexual harassment to both executive level management at Xcel and to Human Resource personnel at Xcel.

74.     Moreover, Kashawny specifically engaged in additional protective activity in late January 2008 when he filed a charge of discrimination with the Equal Employment Opportunity Commission.

75.     Kashawny suffered adverse employment actions by Xcel during the course of his employment, including but not limited to being suspended from his employment, disciplined

while the perpetrators of the hostile work environment and religious and national origin discrimination were not similarly disciplined and ultimately, being discharged in retaliation for his discrimination complaints.

76.    Xcel knew that the Kashawny engaged in the above-stated protective activities. The adverse actions taken by Xcel were a direct cause of Kashawny's complaints of sexual harassment and hostile work environment as well as religious and national origin discrimination.

77.    Xcel's conduct was willful and wanton and were performed in reckless disregard for Kashawny's protected rights against retaliation under Title VII.

78.    As a direct result of Xcel's unlawful and intentional conduct, Kashawny has suffered both economic and non-economic losses and injuries.   Kashawny prays for relief from his injuries and losses as more fully set forth below.

### THIRD CLAIM FOR RELIEF – XCEL

(Sexual Harassment Under Title VII)

79.    Kashawny repeats and realleges all previous paragraphs to his Complaint as thought fully incorporated herein.

80.    Xcel maintained and condoned a sexually hostile work environment which was pervasive and severe.

81.    The sexually hostile and discriminatory work environment to which Kashawny was subjected adversely affected the terms and conditions of his employment with Xcel.

82.    Xcel's conduct in maintaining and condoning a sexual harassment work environment was an unlawful employment practice and in violation of Title VII.

83.     The affect of Xcel's unlawful employment practices has been to deprive Kashawny of equal employment opportunities and otherwise adversely affect his status as an employee.

84.     Xcel's unlawful employment practice was intentional.

85.     Xcel's conduct was willful and wanton and was performed in reckless disregard for Kashawny's protected rights against discrimination under Title VII.

86.     As a direct result of Xcel's unlawful and intentional conduct, Kashawny has suffered both economic and non-economic losses and injuries.  Kashawny prays for relief from his injuries and losses as more fully set forth below.

<u>FOURTH CLAIM FOR RELIEF – XCEL</u>

(Race and National Origin Discrimination Under 42 U.S.C. § 1981)

87.     Kashawny repeats and realleges all previous paragraphs of his Complaint as though fully incorporated herein.

88.     Xcel's conduct as set forth herein deprived Kashawny, an Arab-American, of the right and privileges to make and enforce a contract as protected by Section 1981.

89.     As a proximate result of Xcel's unlawful actions, Kashawny has suffered economic and non-economic damages.

90.     Xcel's violations of Section 1981 were intentional.

91.     Xcel's violations of Section 1981 were willful and wanton and/or were done with malice and/or reckless indifference to Kashawny's federally protected rights.

92.     As a direct result of Xcel's unlawful and intentional conduct, Kashawny has suffered both economic and non-economic losses and injuries.  Kashawny prays for relief from his injuries and losses as more fully set forth below.

<u>FIFTH CLAIM FOR RELIEF – XCEL</u>

(Retaliation Under 42 U.S.C. § 1981)

93.     Kashawny repeats and realleges all previous paragraphs of his Complaint as though fully incorporated herein.

94.     Kashawny engaged in protected activity by complaining of race discrimination to senior executives of Xcel as well as to Human Resource personnel of Xcel.

95.     Kashawny suffered adverse employment action by Xcel during the course of his employment, including but not limited to, being issued a disciplinary letter, being suspended and ultimately being terminated from the employment from Xcel, all in retaliation for his reports of race discrimination.

96.     Xcel knew that Kashawny engaged in the above-stated protected activities.  The adverse actions taken by Xcel were caused by Kashawny's complaints of race discrimination.

97.     Xcel's conduct was willful and wanton, or performed in reckless disregard for Kashawny's protected rights against retaliation under Section 1981.

98.     As a direct result of Xcel's unlawful and intentional conduct, Kashawny has suffered both economic and non-economic losses and injuries.  Kashawny prays for relief from his injuries and losses as more fully set forth below.

## SIXTH CLAIM FOR RELIEF - XCEL

### (Wrongful Discharge in Violation of Public Policy)

99.    Kashawny repeats and realleges all previous paragraphs of his Complaint as though fully incorporated herein.

100.    Xcel terminated Kashawny's employment because he had performed his important job-related right or privilege.  Kashawny believed in good faith that his actions were based upon a clearly expressed public policy concerning the Public Utilities Commission and the obligation of Xcel to comply with such regulations to the benefit of the rate payers.  Kashawny informed Xcel that he believed his actions were based on that public policy.

101.    Xcel wrongfully terminated Kashawny's employment in violation of public policy.

102.    As a direct result of Xcel's unlawful and intentional conduct, Kashawny has suffered both economic and non-economic losses and injuries.

103.    Kashawny's injuries were intended by circumstances of malice and/or a reckless disregard for Kashawny's rights and feelings.  Kashawny prays for relief from his injuries and losses as more fully set forth below.

## SEVENTH CLAIM FOR RELIEF – ABBOUD, OSWALD AND DYBALSKI

### (Outrageous Conduct)

104.    Kashawny repeats and realleges all previous paragraphs of his Complaint as though fully incorporated herein.

105.    Defendants Abboud, Dybalski and Oswald engaged in extreme and outrageous conduct.

106.    The individual Defendants did so recklessly or with the intent of causing Kashawny severe emotional distress.

107.    The conduct of Defendants Abboud, Dybalski and Oswald caused Kashawny severe emotional distress.

108.    As a direct result of the individual Defendants' outrageous conduct, Kashawny has suffered both economic and non-economic losses and injuries.  Kashawny prays for relief from his injuries and losses as more fully set forth below.

<u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff Joseph Kashawny respectfully prays for an order of this Honorable Court entering judgment in his favor against Defendants Xcel Energy Services, Inc. and Defendants Abboud, Dybalski and Oswald, and that it award Kashawny's actual economic damages in an amount to be determined at trial and compensate him for any lost wages, benefits and lost employment opportunities including back pay and front pay, award Kashawny's compensatory damages including but not limited to those for future pecuniary losses, emotional pain and suffering, inconvenience, mental anguish and other nonpecuniary losses, award Kashawny punitive damages as allowed by law and to be determined at trial, award Kashawny reasonable attorneys fees and costs of this litigation, award Kashawny pre-judgment interest and post-judgment interest, as provided by law, and for such other and further relief as this court deems necessary, just and proper.

**PLAINTIFF REQUESTS A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

Respectfully submitted February 27, 2009,

McNAMARA, ROSEMAN,
MARTINEZ & KAZMIERSKI LLP

s/Todd J. McNamara, Esq._____
Todd J. McNamara, Esq.
1640 East 18th Avenue
Denver, Colorado 80218
(303) 333-8700
Fax: (303) 331-6967
Email:  tjm@18thavelaw.com

**Plaintiff's Address:**
Joseph Kashawny
17721 East Maplewood Circle
Aurora, CO  80016