**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 08-cv-02635–WYD–MJW

JOSEPH M. KASHAWNY,

     Plaintiff,

v.

XCEL ENERGY SERVICES INC., a Delaware Corporation; CAMILLE ABBOUD; JACK DYBALSKI; and CARY OSWALD,

     Defendants.

---

**DEFENDANTS XCEL ENERGY SERVICES INC. AND JACK DYBALSKI'S
MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

---

This is a case about a bruised ego, not discrimination or retaliation. In February 2007, Plaintiff's mentor and the man who hired Plaintiff, Jack Dybalski ("Dybalski"), promoted Defendant Camille Abboud ("Abboud") (an Arab-American) over Plaintiff in the midst of a departmental reorganization. Afterwards, Plaintiff withdrew from his friendship with Abboud, and began tracking Abboud's every move, taking notes of his schedule, meals and travel (but not any alleged discrimination or retaliation). Plaintiff also became increasingly negative towards Defendant Cary Oswald ("Oswald") when he too was promoted; Plaintiff thought he was smarter and professionally more talented. Mostly, Plaintiff just hated that Oswald is openly gay.

In the months following the reorganization[1], Plaintiff felt marginalized at work, and discussed these feelings with his friend Gil Heller ("Heller"). Heller recalls:

> [Plaintiff felt] that he'd been treated unfairly and he was interested in remedying the unfairness, wanted – in particular the reorganization that he thought was unfair. Dybalski had promised him things that he never followed through on, and

---

[1] This reorganization is not the basis for any of Plaintiff's allegations or claims (*i.e.* there is no failure to promote claim). Any such claim would be time barred in any event.

> that he had always tried to -- he thought they were best friends actually, thought he'd been stabbed in the heart when this had happened to him. They used to go hunting.... So he thought they were good friends, and he was very upset about having been in essence violated....He indicated it was like being stabbed in the heart or stabbed in the back ....

Deposition of Gilbert B. Heller ("Heller Dep.") (Ex. A hereto) at 200:19-201:12.

Then, on the morning of January 3, 2008, Plaintiff stormed into Dybalski's office and demanded that Dybalski undo the reorganization so Plaintiff would once again report to Dybalski (not Abboud). When Dybalski refused, Plaintiff screamed at him - so loudly that other employees could hear Plaintiff through Dybalski's office door, and Dybalski's assistant considered interrupting the meeting. Plaintiff then threatened that he was going to "take the Company down." Within minutes of this meeting, Dybalski reported the threat. Realizing he had gone too far and facing crisis suspension for his threats, Plaintiff got desperate and he concocted allegations of abuse and harassment. Not coincidentally, every one of Plaintiff's allegations is aimed at the two people who were promoted above him in 2007 (Abboud and Oswald) and at Dybalski, the man who "stabbed him in the heart." It is ironic that Plaintiff's allegations are focused on the person who promoted Plaintiff repeatedly, and who has hired and promoted more minorities and protected classes[2] than one would imagine reading Plaintiff's outlandish claims.

As set forth below, each of Plaintiff's claims is groundless and Defendants are entitled to Summary Judgment in their favor. To summarize:

- Plaintiff's claim for hostile work environment based on national origin/religion in violation of Title VII is time-barred, and the conduct alleged did not produce a work environment that could be deemed legally "hostile."
- Plaintiff's claim for sexual harassment fails because: (1) the alleged sexual harassment did not alter the terms and conditions of Plaintiff's employment; (2) the alleged

---

[2] Dybalski, Chief Risk Officer, hired Plaintiff, and currently oversees five employees that report directly to him. They are Oswald, Abboud, Heller, Jannell Marks, and Christine Carter. <u>All five of these individuals belong to protected classes</u>. Oswald is gay (a protected class under Colorado state law), Abboud is an Arab-American, and both Jannell Marks and Christine Carter are women. All five are age-protected.

harassment was not "severe"; and (3) Plaintiff cannot identify any legal basis for holding the Company liable (for a co-workers alleged acts).

- Plaintiff's claims for retaliation under Title VII and 42 U.S.C. § 1981, based on: (1) his crisis suspension; (2) his written warning and; (3) his termination, fail as a matter of law. First, neither Plaintiff's suspension nor his discipline was an adverse employment action. Secondly, Plaintiff cannot establish any causal connection between his so-called complaint of discrimination and his termination. Finally, Plaintiff cannot establish that the Company's reasons for ending Plaintiff's employment are pretext.

- Plaintiff's disparate treatment claim under Title VII also fails as a matter of law because first, as in Plaintiff's retaliation claim, Plaintiff's written warning had no effect on Plaintiff's employment status, salary, or benefits, and thus, was not an adverse employment action. Further, Plaintiff cannot show his termination occurred under circumstances giving rise to an inference of discrimination or that any of the stray remarks alleged were connected to his termination. Plaintiff also cannot show pretext.

- Plaintiff's claim under 42 U.S.C. § 1981 should also be dismissed because: (1) discrimination based on national origin is not actionable under § 1981; (2) Plaintiff's "race" is Caucasian through his own admission; and (3) Plaintiff's allegations of discrimination depend solely on his place of birth (Morocco).

- Plaintiff's claim for wrongful discharge in violation of public policy fails as a matter of law because Plaintiff acknowledged in his deposition that he has no facts supporting this claim. Nor did Plaintiff have a good faith belief of any wrongdoing.

- Finally, Plaintiff's outrageous conduct claim fails on multiple grounds.  In addition to the reasons set forth in the Individual Defendant's Motion to Dismiss Plaintiff's Seventh Claim for Relief, Plaintiff cannot establish that: (1) the Individual Defendants engaged in extreme and outrageous conduct; (2) the Individual Defendants engaged in the alleged conduct recklessly or with the intent of causing the Plaintiff severe emotional distress; or (3) the Individual Defendants' conduct caused Plaintiff to suffer severe emotional distress. Plaintiff in fact denied having any medical complaints or even missing any work as a result of the alleged conduct.

## STATEMENT OF UNDISPUTED FACTS

For purposes of this Motion only, the following facts are undisputed:

**The Defendants**

1.    Xcel Energy Services Inc. is a service company providing corporate services to the Xcel Energy Inc. family of companies, including Minnesota-based Northern States Power Company ("NSP").  See Xcel Energy Services Inc.'s Answer to Am. Compl. at p. 2, ¶ 2.

2.    Dybalski is the Vice President and Chief Risk Officer of the Company's Risk Management department.  Dybalski Deposition ("Dybalski Dep.") (Ex. B hereto) at 4:11-13.

3.      Abboud is an Arab-American.   Camille Abboud Deposition ("Abboud Dep.") (Ex. C hereto) at 21:15-20.  He was hired by the Company in 1990, and until the reorganization, was Plaintiff's peer. Kashawny Deposition ("Kashawny Dep.") (Ex. D hereto) at 185:19-25; Abboud Dep. at 4:23-5:3; 25:11-27:3. In 2007, Abboud was promoted to his current position as Managing Director and became Plaintiff's supervisor. Kashawny Dep. at 184:2-7; 188:16-19.

4.      Oswald is the Managing Director of Risk Strategy and Control. Cary Paul Oswald Deposition ("Oswald Dep.") (Ex. E hereto) at 4:15-17. He was hired by the Company in 1999, and prior to February 2007, he was also a peer of Plaintiff. Oswald Dep. at 5:6-8; Kashawny Dep. at 185:19-25.   As with Abboud, Oswald was promoted to Managing Director during the reorganization. Oswald Dep. at 4:18-20.  Oswald has never been Plaintiff supervisor, (Kashawny Dep. at 146:8-10), and has never had any input into Plaintiff's performance reviews. See Xcel Energy Services Inc.'s Responses to Plaintiff's Second Requests for Discovery (Ex. F hereto). Further, Plaintiff and Oswald worked in different departments.  See Oswald Dep. at 18:9-12.

**Plaintiff's Work History**

5.      On June 21, 1999, Plaintiff began working in the Company's Minneapolis office as a Financial Engineer Consultant. (See Am. Compl. at ¶ 7.)  Plaintiff was interviewed and hired by Dybalski. Kashawny Dep. at 68:9-22.

6.      Plaintiff was hired as an at-will employee and signed an acknowledgement that his employment was at-will on August 22, 2001. See Kashawny Dep. Ex. 10.[3]

7.      Throughout the years Plaintiff worked at the Company, and in particular, under Dybalski, Plaintiff received numerous raises and promotions. See Kashawny Dep. Ex. 15.

---

[3] Deposition exhibits are collectively attached hereto as Ex. G.

8.      Plaintiff's first promotion came only fourteen months after being hired. (Id.) During a corporate merger in 2000, Dybalski promoted Plaintiff to the position of Director, Market Pricing. As a result of Kashawny's promotion, Dybalski approved an increase to Kashawny's annual salary of $9,500.  See Kashawny Dep. Ex. 15  In addition, Plaintiff's annual salary steadily increased every single year of his employment, by approximately $4,000 annually, until his termination on March 3, 2008.  (Id.)

9.      In 2000, Plaintiff moved to Denver with Dybalski and other of Dybalski's direct reports. As a result of the merger, Plaintiff became an employee of Xcel Energy Services Inc. (See Am. Compl. at ¶ 7; Xcel Energy Services Inc.'s Answer to Am. Compl. at ¶ 7.)

10.      In April 2002, as part of a larger reorganization, Plaintiff's title was changed to Director, Risk Analytics. At that time, Plaintiff was part of a small department of analysts and managers whose major responsibility was to develop financial models and forecast electric and gas utility market prices.  (See Am. Compl. at ¶¶ 57-58.)

11.      In Denver, Plaintiff reported (again) to Dybalski.  Kashawny Dep. at 184:19-25.

12.      Dybalski and Plaintiff were not only boss and subordinate, but were friends as well. They went hunting and socialized together. (Kashawny Dep. at 48:11-18; 49:25-50:4; Heller Dep. at 200:17-201:12.)

13.      Plaintiff considered Dybalski a mentor and respected Dybalski tremendously. See Heller Dep. at 200:17-201:12.

14.      In 2002, Plaintiff even passed up a more lucrative opportunity outside the Company to stay with Dybalski. Kashawny Dep. at 272:5-10; 272:23-273:2.

15.     Plaintiff and Abboud were also friends. They regularly went to lunch and happy hours. Kashawny Dep. at 47:4-17; 49:1-24. They also traveled together for work on a frequent basis and socialized harmoniously. Kashawny Dep. at 49:1-16.

16.     Plaintiff described Abboud as a jokester. Kashawny Dep. at 51:25-52:3, 52:4-12.

17.     Plaintiff never took Abboud's comments seriously – he knew that Abboud was joking around. Kashawny Dep. at 56:4-16.

18.     Plaintiff's friend, Heller, testified that the general atmosphere was childish and that the Individual Defendants joked with everyone. Heller Dep. at 160:6-13.

19.     Another employee, Kathy Leising, testified that jokes were also played on Abboud. Kathy Leising Deposition ("Leising Dep.") (Ex. H) at 103:13-24.

20.     Oswald and Plaintiff did not have the same type of friendly relationship. Oswald Dep. at 22:2-6.

21.     Oswald is gay and felt that Plaintiff was homophobic. Oswald Dep. at 33:20-34:7.

22.     In fact, many years ago, Oswald was informed by Abboud that Plaintiff had raised his fist when talking about Oswald and threatened that "if that homosexual ever comes near me I'm going to – I'm going to punch him." Oswald Dep. at 21:11-15.

23.     After hearing that story, Oswald made concerted efforts to avoid Plaintiff. (Affidavit of Ravikrishina Duggirala ("Duggirala Aff.") (Ex. I hereto) at ¶ 20.

24.     Then, in 2004, Plaintiff sent Oswald an email claiming that Oswald had offended Plaintiff. Oswald Dep. at 34:8-17.  Not knowing what Plaintiff was referring to and feeling set up, Oswald consulted an external HR representative who was a family friend, and continued to avoid Plaintiff.  Oswald Dep. at 47:7-48:8.

**The Reorganization in 2007**

25.     In February 2007, there was a restructuring of the Risk Management organization. <u>See</u> Kashawny Dep. Ex. 11; Kashawny Dep. at 184:2-7.

26.     Abboud was promoted from Director to Managing Director and Plaintiff began reporting to Abboud rather than to Dybalski. Kashawny Dep. at 184:19-25; 185:21-186:3; 188:16-19; <u>See</u> Kashawny Dep. Ex. 11.

27.     Dybalski's held weekly staff meetings for his direct reports. Dybalski Dep. at 84:5-9. After the February 2007 reorganization, however, and since Plaintiff no longer reported to Dybalski, Plaintiff was not present in Dybalski's weekly staff meetings.  Heller Dep. at 92:17-93:7; 157:19-24; Leising Dep. at 29:1-5.

28.     Notably, Plaintiff did not feel the reorganization was "fair" and it upset him greatly. Kashawny Dep. at 189:14-20; Heller Dep. at 114:18-20; 114:22-115:16; 212:6-17; Morrato Deposition ("Morrato Dep.") (Ex. J) at 53:16-24; 90:17-21.

29.     Plaintiff wanted the promotion that Abboud (an Arab-American) had received. Kashawny Dep. at 190:2-8.

30.     Plaintiff's friend and co-worker, Gil Heller, recalls that Plaintiff was upset with the reorganization because he felt as though he deserved a promotion. Heller Dep. at 200:17-201:12.

31.     Even though Plaintiff's reporting structure was changed, he remained Director after the reorganization. Kashawny Dep. at 189:5-9.

32.     Plaintiff was neither promoted nor demoted, and his salary, benefits, and title remained the same as before the restructure. (<u>Id.</u>)

33.     Other employees were not as fortunate as Plaintiff during the restructure; some were demoted to lower positions. Morrato Dep. at 56:19-23.

**After the Reorganization**

34.     After the reorganization, Plaintiff was frequently upset. Dybalski Dep. at 42:2-13.

35.     Plaintiff complained about the reorganization, complained about his new supervisor, Abboud, and demanded that Dybalski change the reporting structure back. (Id.)

36.     Plaintiff also stopped socializing with Abboud, and began tracking Abboud - his presence or absence at work, his lunches, and his business travel.  See Kashawny Dep. Exs. 30, 33.

37.     Plaintiff would even send emails about Abboud's activities to his home computer. Kashawny Dep. at 289:12-20; Kashawny Dep. Exs. 30, 33.

38.     Plaintiff also started a friendship with another co-worker, Francis ("Joe") Morrato ("Morrato"), a Caucasian male, after the reorganization. The two were disgruntled by the reorganization, and bonded in that way.  Morrato Dep. at 88:15-22. Morrato understood that Plaintiff felt unappreciated and upset about the reorganization, and the two commiserated with each other.  Morrato Dep. at 90:8-21.

39.     Plaintiff's other friend in the department, Heller, also testified that after the reorganization, Plaintiff told Heller that Dybalski had "stabbed him in the heart" by not promoting him. Heller Dep. at 200:17-201:20.

40.     Throughout 2007, Plaintiff had problems taking direction from Abboud, and accepting his former friend and peer's advice and direction. Kashawny Dep. Exs. 28, 29, 31, 32.

41.     While Abboud was on vacation in Lebanon over the holidays, Plaintiff reached his breaking point. Abboud Dep. at 118:19-119:19; Dybalski Dep. at 41:22-42:16.

**The January 3, 2008 Meeting**

42. On January 3, 2008, Plaintiff went to Dybalski's office. Kashawny Dep. at 240:1-8; Dybalski Dep. at 39:10-13.

43. Ravikrishna Duggirala ("Duggirala"), a co-worker, saw Plaintiff on the way to Dybalski's office that morning, and noticed that Plaintiff was visibly upset. Duggirala Aff. at ¶ 9. When Duggirala asked Plaintiff what was the matter, Plaintiff indicated that he was "pissed off" about Abboud. Id.

44. Plaintiff began his conversation with Dybalski by complaining about an email Plaintiff received from Abboud regarding a computer monitor Plaintiff purchased and a conference Plaintiff wanted to attend. Kashawny Dep. at 240:9-23.

45. Plaintiff then started complaining to Dybalski about Abboud's business expenses, trips, and conferences. Kashawny Dep. at 240:18-245:17.

46. In the same conversation, Plaintiff brought up the reorganization. Kashawny Dep. at 246:14-17. He told Dybalski to reverse the decision to have him report directly to Abboud. Dybalski Dep. at 41:22-42:4. Dybalski told Plaintiff that he was not going to change the structure of the group. Kashawny Dep. at 249:2-22.

47. Plaintiff responded by yelling at Dybalski, who described the interaction as: Plaintiff had "lost it emotionally" and that "he was visibly upset, his [] face was [] swelling," and Dybalski "could see the veins in his face." Dybalski Dep. at 43:1-10. "He became so upset and he was breathing heavily that he was actually projecting saliva out of his mouth," which Dybalski "had to wipe of [his] desk after [Plaintiff] left." (Id.)

48. Even Duggirala, who was in his office approximately ten meters away, could hear Plaintiff yelling at Dybalski through Dybalski's closed office door.  Duggirala Aff. at ¶¶ 13-16.

49.     Dybalski's administrative assistant, Christine Carter, sat right outside Dybalski's office. She was concerned for Dybalski after hearing Plaintiff screaming and considered interrupting the meeting.  Cocchiarella Dep. Ex. 17.

50.      Most important to this case, is that Plaintiff stood up and proclaimed "I am going to take the Company down." Dybalski Dep. at 42:11-16. Plaintiff then stood in front of Dybalski for three to four more minutes, face swelling, veins popping from his face, and breathing heavily. (Id.) Immediately after the meeting, Dybalski contacted Marvin McDaniel, VP of human resources, to report the incident.  Dybalski Dep. at 44:23-45:7, Dybalski Dep. Ex. 51.

**Investigation Into The January 3, 2008 Incident**

51.     Patrice Miller ("Miller"), an EEO consultant with the Company, initiated an investigation into Plaintiff's behavior during the January 3, 2008 meeting. Patrice Miller Deposition ("Miller Dep.") (Ex. K) at 4:23-5:12.

52.     On the afternoon of January 3, 2008, Miller and Ed Lutz ("Lutz"), the Company's VP of Workforce Relations, called Dybalski. Miller Dep. at 49:11-50:2.

53.     Dybalski described that Plaintiff had threatened he was going to bring the Company down or take the Company down. Miller Dep. at 50:3-14.

54.     On January 4, Miller met with Dybalski and Plaintiff. Miller Dep. at 60:23-61:6.

55.     Dybalski recounted what happened and recalled that Plaintiff had accused Dybalski of "thinking" Plaintiff was a "sand nigger" and "goat herder" in the midst of his screaming, stating, "do you think I am a sand nigger or a goat herder?"  Miller Dep. at 65:8-19; Dybalski Dep. at 42:14-10.

56.     Dybalski told Miller that after Plaintiff made those comments, Dybalski told Plaintiff the meeting was over, and that is when he immediately contacted human resources. Miller Dep. Ex. 44.

57.     Upon hearing the terms "sand nigger" and "camel jockey" in Dybalski's description of events, Miller stated that she needed to start a separate investigation regarding those allegations. Miller Dep. at 65:8-66:3.

58.     Plaintiff was put on crisis suspension pending the investigation into his January 3rd threat against the Company. Miller Dep. at 66:6-9; 69:7-18. And Plaintiff remained on crisis suspension until the investigation regarding his behavior on January 3, 2008 was complete. Kashawny Dep. at 164:24-165:10.

59.     Plaintiff was scheduled to return to work on February 26, 2008.  (Id.)

60.     The entire period Plaintiff was out on suspension, he was paid his regular salary and received his other benefits. Kashawny Dep. at 182:6-8.

**Plaintiff's Allegations of Discrimination, and the Resulting Investigations**

61.     As a result of Plaintiff's claim that the terms sand nigger and camel jockey had been used, Miller opened another investigation, one separate and distinct from the investigation that had been started into Plaintiff's behavior on January 3rd. Miller Dep. at 65:8-66:3.

62.     On January 7, Miller met with Plaintiff to obtain his statement. Miller Dep. Ex. 49.

63.     At that time, Plaintiff alleged that unlawful comments were made at a 2002 Company dinner. Specifically, Plaintiff stated there were offensive comments made by a Tom Imbler, about immigrants. Kashawny Dep. at 90:8-17; 93:23-94:8; 94:16-19; 95:14-96:20.

64.     Plaintiff also alleged that he had been called the following names by Dybalski, Abboud and/or Oswald: sand nigger, goat herder, camel jockey and blackberry. (Id.) He also alleged that he had been told to "eat shit."  (Id.)

65.     Despite this allegation, Plaintiff has since acknowledged that goats are not associated with any particular part of the world (Kashawny Dep. at 341:20-23), nor is a goat associated with any particular religion. Kashawny Dep. at 341:24-342:3.

66.     Plaintiff further alleged that Dybalski, Abboud and/or Oswald would laugh and grab their nose when he walked by, and they would make fun of his accent. Miller Dep. Ex. 49.

67.     And Plaintiff alleged that "someone" put a flyer in his office of a parody of a Sinatra song which was about a terrorist on a plane who was smelly. (Id.)

68.     Plaintiff also alleged to Miller that Dybalski would say "Allah Akbar" near Plaintiff and that on one occasion, Dybalski pointed to sand in Plaintiff's office and asked Plaintiff if it reminded him of home. (Id.)

69.      Plaintiff alleged that on another occasion, Dybalski was laughing with Carter and said that Plaintiff looked like the President of Iran. (Id.)

70.     Plaintiff since acknowledged that comparing his physical looks to Ahmadinijad is not related to either his religion or national origin. Kashawny Dep. at 342:24-343:5.

71.     Finally, Plaintiff alleged that Abboud did not hire a job applicant because he was Jewish, and Dybalski approved of that decision based on what Israel was "doing to" Lebanon. Kashawny Dep. at 197:8-180:14; see also Kashawny Dep. Ex. 26.

72.     Notably, it was only after Plaintiff was under investigation himself (for his behavior on January 3rd) that he made any of the above allegations. Miller Dep. Ex. 49.

73.     Plaintiff was aware of Alert line, the Company's hotline for internal complaints. Kashawny Dep. at 57:20-25.

74.     Plaintiff admitted that he never attempted to use Alert line. Kashawny Dep. at 59:17-22.

75.     Plaintiff also admitted that his responsibilities as a manager required that he familiarize himself with the Company's policies. Kashawny Dep. at 61:9-12.

76.     Each year, managers are required to complete compliance training via online courses; this training includes an annual review of the Corporate Code of Conduct. Abboud Dep. at 67:5-21.

77.     In addition, all managers were required to take EEO & Affirmative Action Training on an annual basis. Abboud Dep. at 67:9-15.

78.     Plaintiff completed both courses, and therefore, knew (i) his obligation to report allegations of discrimination and harassment, and (ii) the avenues for raising those complaints. Kashawny Dep. at 60:24-61:8.

79.     Furthermore, Plaintiff was in contact with HR starting in 2002, so he had access to HR in order to make his complaints, despite not doing so until he was under investigation himself. Kashawny Dep. at 63:15-20; 64:5-15. In 2006, Plaintiff even worked with Christine Cocchiarella, the Company's Director of EEO, regarding one of Plaintiff's employees; therefore Plaintiff knew she was available to hear any concerns. Kashawny Dep. at 64:5-15.

80.     Plaintiff worked with Cocchiarella on two separate occasions between 2004 and 2007. Christine Cocchiarella Deposition ("Cocchiarella Dep.") (Ex. P) at 49:11-50:4. Yet these conversations only revolved around either the fact that Plaintiff was not following the Company's hiring and retention procedures or that Plaintiff wanted to fire employees under him.

Kashawny Dep. at 64:5-15. Further, between 2004 and 2008, Miller worked with Plaintiff regarding communication issues with one of Plaintiff's employees. Miller Dep. at 35:18-37:25.

**Plaintiff's Failure to Tie his Allegations to Protected Classes or Conduct.**

### A.     Race/National Origin

81.     Plaintiff was born in Morocco and admits that he does not consider himself a "race" other than either Moroccan or Caucasian. Kashawny Dep. at 12:2-3; 16:3-17:16.

82.     When asked if Plaintiff viewed himself as an Arab-American, he testified that his own definition of Arab-American is "somebody who speaks Arabic." And that "Arab is really just a language in [his] mind.  It's not a culture. It's nothing beyond a language." Kashawny Dep. at 17:17-18:6.

83.     Further, Plaintiff's primary language is <u>French</u>, not Arabic. Kashawny Dep. at 18:12-18; 19:3-5.

84.     Thus, according to his own definition of Arabic, Plaintiff is not an Arab-American. Kashawny Dep. at 17:17-18:6.

85.     Plaintiff admits, however, that Abboud is Arab-American, and that Plaintiff has never seen the Company discriminate against Abboud. Kashawny Dep. at 193:18-20.

86.     Finally, Plaintiff testified that he never saw Oswald or Dybalski do or say anything inappropriate to Abboud in all the years they have worked together. Kashawny Dep. at 193:18-24.

87.     On the other hand, Plaintiff testified that Heller, a Caucasian male, was the target of several comments because he is from France. Kashawny Dep. at 55:16-22; 56:4-16.

### B.     Religion

88.     Plaintiff testified that he has never belonged a mosque. Kashawny Dep. at 20:20-21:2.

89.     He has also never practiced his Muslim religion outside of his home. Kashawny Dep. at 21:23-22:3.

90.     In fact, Plaintiff testified that he made distinct efforts <u>not</u> to mention his religion to anyone in the workplace. Kashawny Dep. at 22:20-25.

91.     He admittedly shaves his facial hair once to twice daily, and swears (conduct wholly inconsistent with Muslim beliefs). Kashawny Dep. at 23:16-22.

92.     Plaintiff's allegations to Miller of alleged national origin discrimination were vague and did not point to any specific dates. Miller Dep. Ex. 49.

93.     Similarly, in his deposition, Plaintiff could not recall any specific dates involving religious discrimination against him other than one dinner he thought happened in September <u>2002</u>. Kashawny Dep. at 69:24-73:11.

94.     Plaintiff just cannot say "who said what when." Kashawny Dep. at 72:23-73:11.

95.     In fact, Plaintiff cannot give any specific date of religious or national origin discrimination. Kashawny Dep. at 73:12-74:5; 76:3-13.

96.     Plaintiff also states that he will not even talk about religion, and that he has made signs of the cross in public. Kashawny Dep. at 84:10-85:8. Even Morrato thought that Plaintiff was agnostic. Morrato Dep. at 46:23-47:1.

97.     Plaintiff admitted that the Company may not have known he was Arab or Muslim. He testified: "I was a U.S. citizen.  I don't discuss religion. Like I said, I try to fit in. When I go out, I do exactly what any Christian American does. I am totally American. I love the United

States. I will do anything for it.  I never said that I wasn't. Since '85 I have been an American citizen, so I always thought myself as an American." Kashawny Dep. at 82:9-24.

98.     In addition, Plaintiff was educated in the U.S. and has lived in the U.S. on two different occasions, the most recent being from 1982 to the present. Kashawny Dep. at 12:16-25. Plaintiff married a woman in the U.S., and his daughter was born and raised in Minnesota. Kashawny Dep. at 10:2-11:15.

**Plaintiff's Allegations of Financial Improprieties**

99.     During his meeting on January 7, 2008 with Miller, Plaintiff brought up – for the first time - allegations of financial improprieties regarding Oswald, Abboud and/or Dybalski. Miller Dep. Ex. 49.

100.     Plaintiff claimed that Dybalski, Abboud and Oswald were doing "things" that put the Company at risk, that he did not trust Abboud, and that Abboud was "using Company expenses for personal use." (Id.)

101.     Plaintiff told Miller that Abboud was using expenses for personal use in Las Vegas and Florida, and that Abboud "goes somewhere every week." (Id.)

102.     Plaintiff also claimed that Dybalski was jeopardizing the Company based on decisions Dybalski was making because "even if [I] say a deal shouldn't go through, Dybalski does it anyway." (Id.)

103.     Next, Plaintiff alleged that Oswald had lost money on transactions and tried to hide it from the Board by telling them the deal had insurance when it did not. (Id.)

104.     Plaintiff also claimed that he knew of other "people" who had lied to the Board but that he would only discuss the details with the President of the Company or the Vice President of Human Resources. (Id.)

105.    Despite these allegations of widespread improprieties to Miller, when asked about the same allegations in his deposition, Plaintiff admitted that he did not have any evidence of any such improper behavior and could not provide any specifics. Kashawny Dep. at 155:12-157:4. Kashawny then explained that he didn't report these allegations to any authorities because:

> [F]or the simple reason that I don't have any facts.  I have suspicions of illegal activity taking place, and when I talked to Xcel, I was hoping that Xcel as a good -- you know, because we represent, after all, Xcel is really owned by the rate payer.  We go and do their own checking and make sure that, you know, the things that appear as inappropriate is not; or if it is, that they can take corrective action.  So I don't have any proof of any illegal activity, because, like I explained, I am an analyst.  I tell people what the price should be or shouldn't be.  When I feel like something is wrong, I tell my boss or I sign the papers saying, no, I don't think this is the correct price.  But I don't know for sure if that transaction is approved, if the deal is made.  I'm in no position to know that.

Kashawny Dep. at 156:13-157:4.

106.    Further, Plaintiff admitted that he never went to the Attorney General's office to complain about anything he saw in the workplace. Kashawny Dep. at 155:12-16; 155:17-20.

107.    Plaintiff also admitted that when he was an employee of the Company, he never went to any governmental agency - the PUC, or any other agency - to complain about anything that was occurring in the workplace. Kashawny Dep. at 155:21-156:1.

108.    Notably too, Plaintiff has not made any complaints to any governmental agency (other than the EEOC charge relating to this case) since leaving the Company. Kashawny Dep. at 156:2-5.

109.    Plaintiff explained in his deposition that he has not complained about what he allegedly "saw" at the Company "for the simple reason that I don't have any facts" and "I don't have any proof of illegal activity." Kashawny Dep. at 156:2-157:4.

**Plaintiff's Allegations of Sexual Harassment**

110.    On January 7, 2008, Plaintiff further alleged to Miller that he was being sexually harassed by Oswald. Miller Dep. Ex. 49.  Plaintiff claimed that the harassment began in 2002 or 2003.  Kashawny Dep. at 124:14-18; 135:5-13.

111.    He claimed that Oswald <u>slapped</u> him on the butt and put his hand on his <u>leg</u>. Miller Dep. Ex. 49.

112.    Plaintiff stated that it was not because Oswald "wants to screw" but "to show who is the boss." (<u>Id.</u>)

113.    In addition, despite these allegations, Plaintiff continued his interactions with Oswald, including lunches, socializing with him at Company events and going to Oswald's house for a holiday celebration. Kashawny Dep. at 47:1-17; 49:17-24.

114.    Over the course of the litigation, however, Plaintiff's allegations of sexual harassment against Oswald have changed repeatedly. <u>See generally</u>, Miller Dep. Ex. 49, Kashawny Dep. Ex. 8, Am. Compl. at ¶¶ 21-23.

115.    In his Amended Complaint filed on February 27, 2009, Plaintiff alleges that "on a number of occasions, Oswald slapped him, touched Plaintiff's posterior, grabbed him, put his hands on Plaintiff's legs and made suggestive sexual advances." (Am. Compl. at ¶ 22.)

116.    Yet, Plaintiff never made any allegations to Miller that Oswald "made suggestive sexual advances." Miller Dep. Ex. 49.

117.    In his deposition, Plaintiff came up with several never-before-heard allegations regarding Oswald: Plaintiff testified that Oswald <u>grabbed</u> his <u>crotch</u>, grabbed his upper thigh, <u>grabbed his butt (both buttocks)</u>, and <u>squeezed his butt, **upwards of 50 times**</u> each in the workplace. Kashawny Dep. at 127:23-134:25; 139:23-141:23; 347:4-19.

118.    When asked to describe the alleged interactions, Plaintiff testified that Oswald would grab his crotch in the copier room and around work. Kashawny Dep. at 128:13-20.

119.    Plaintiff also testified that when Oswald would grab his crotch, Plaintiff would not say anything; he would just look at Oswald, and "walk away" as Oswald was grabbing his crotch. Kashawny Dep. at 141:2-23.

120.    Plaintiff also claimed in his deposition that he thought Oswald was hitting on him, despite having told Miller on January 7, 2008, that Oswald's alleged conduct was not because Oswald "want[ed] to screw." Kashawny Dep. at 131:19-23.

121.    When asked in his deposition whether he was homophobic, Plaintiff replied that a lot of his "best friends are homosexual."  Kashawny Dep. at 142:11-143:1. He just couldn't remember any of his best friends' names. (Id.)

122.    Plaintiff volunteered, however, that he admires homosexuals as "they are more sophisticated than the average person in art, music, culture, and opera."  Kashawny Dep. at 142:19-143:1.

123.    Dybalski testified regarding an instance, however, when Plaintiff was expressing displeasure with Oswald, and Plaintiff stood with a clenched fist and said "[a]nd he's a homosexual and he better never come near me." Dybalski Dep. at 36:22-37:10.

124.    Even Plaintiff's friends, Heller and Morrato, testified that Plaintiff may have called Oswald a "faggot."  Heller Dep. at 232:23-25; Morrato Dep. at 66:1-5.

**Financial Improprieties Investigation**

125.    As a result of Plaintiff's allegations to Miller on January 7, 2008, a separate investigation was commenced by the Company regarding the alleged financial improprieties and Abboud's expense reporting. Cocchiarella Dep. at 55:21-56:12.

126.     On January 10, 2008, Cocchiarella interviewed Plaintiff to uncover any additional information about alleged financial improprieties.  Cocchiarella Dep. at 55:21-56:12.

127.     In that meeting, Plaintiff named Dybalski, Oswald, and Abboud and stated that they were "doing things that put the Company at risk", and they should be fired without compensation. See Cocchiarella Dep. Ex. 1.

128.     Plaintiff also told Cocchiarella that he was demoted (which was untrue – Plaintiff admitted he has never been demoted, and that he "has reason" to be suspicious. Kashawny Dep. at 218:15-17.

129.     After several failed inquiries by Cocchiarella for details, Plaintiff finally named a few deals that he thought were suspicious; however, he could not give reasons as to why they were suspicious. See Cocchiarella Dep. Ex. 1.

130.     Cocchiarella thoroughly investigated all of Plaintiff's allegations, including each deal he named, and audited Abboud's expense reports. (Id.)

131.     The result of her investigation was that each and every allegation by Plaintiff was unsubstantiated.  Cocchiarella Dep. at 226:11-15.

**The Other Investigations**

132.     The investigation into Plaintiff's actions on January 3, 2008, toward Dybalski, however, was still ongoing. Cocchiarella took over that investigation, while Miller focused on the investigation into Plaintiff's allegations of discrimination and sexual harassment.   Miller Dep. at 74:6-9; Cocchiarella Dep. at 68:11-69:10.

133.     On January 24, 2008, Cocchiarella issued a report regarding Plaintiff's behavior on January 3, 2008. See Investigation Report dated January 24, 2008 (Ex L.)

134.    Cocchiarella determined that it was more likely than not that Plaintiff threatened the Company by stating he would "bring the Company down" and engaged in improper, unprofessional and unacceptable behavior by shouting at Dybalski and demanding Dybalski rescind the organizational changes of February 2007. (Id.)

135.    That same month, Miller issued a report regarding Plaintiff's allegations of discrimination and sexual harassment. Cocchiarella Dep. Ex. 6.

136.    The results of that investigation found that some of Plaintiff's allegations had been substantiated in part. (Id.)

137.    Miller found that inappropriate comments had been made, but dates, times and specific individuals who made the comments were vague and inconsistent. (Id.)

138.    As a result of her findings, Oswald, Abboud, Dybalski, and Heller (Plaintiff's friend, and the only one Plaintiff did not sue here) were all issued Oral Reminders. (Id.)

139.    Miller contacted Plaintiff to inform him of the results of her investigation. Miller Dep. at 34:18-35:5. (Miller customarily notified a complainant of the results of an investigation after it was complete.)  (Id.)

140.    Miller informed Plaintiff that some of his allegations were substantiated in part and found to be a violation of Company policy. Miller Dep. at 35:6-13.

**February 25, 2008 Meeting**

141.    On February 25, 2008, Cocchiarella met with Plaintiff to give Plaintiff the results of her investigation into his confrontation with Dybalski. See Cocchiarella Notes Re: February 25, 2008 Meeting with Plaintiff (Ex. M); Kashawny Dep. at 149:9-17.

142.     Cocchiarella informed Plaintiff that she determined he did yell at Dybalski, and made a threatening comment that violated the Company's workplace violence policy.  As a result, Plaintiff was to be issued a "Written Reminder–Conduct." See Ex. M.

143.     Cocchiarella also told Plaintiff that he should meet his supervisor, Abboud, the following day to receive his Written Reminder, and return to work.  (Id.); Kashawny Dep. at 157:5-11.

**February 26, 2008**

144.     On February 26, 2008, Plaintiff arrived for his scheduled meeting at the Company. When Cocchiarella approached Plaintiff in the building lobby, he asked if he could speak with Cocchiarella alone first. See Cocchiarella Notes Re: February 26, 2008 Meeting with Plaintiff (Ex. N).

145.     Cocchiarella agreed and took Plaintiff into a private room. (Id.)

146.     Once in the room, Plaintiff told Cocchiarella that he respected her and knew that she was doing her job but that he did not believe she would fully investigate Plaintiff's allegations of financial improprieties. (Id.)

147.     Cocchiarella disagreed and told Plaintiff that she conducting a full investigation and would let Plaintiff know when the investigation was completed. (Id.)

148.     Plaintiff then said that once he was returned to work, he would expect that all work assigned to his staff would go through him first. (Id.)

149.     Cocchiarella reminded Plaintiff that he would be returning to work reporting and taking work direction from Abboud. (Id.)

150.     Plaintiff then told Cocchiarella, "I really like you so I caution you – don't perjure yourself – I've recorded my meetings." (Id.)  Cocchiarella responded that Company policy

prohibits recording, as she had told him in their very first meeting in the beginning of January. (Id.)  Cocchiarella told Plaintiff that if he was recording the conversations then he needed to stop immediately. (Id.)

151.   Plaintiff admitted that he recorded his meeting with Dybalski and Miller and told Cocchiarella that he would give her copies of the tapes. (Id.)  Cocchiarella told Plaintiff she wanted those copies and reminded him he had violated Company policy by recording those conversations. (Id.)

152.   Plaintiff then told Cocchiarella that he had recorded all the conversations to his home phone with Miller and that since it was his home phone he "had every right" to record those conversations. (Id.)  Cocchiarella told Plaintiff that electronic recording is prohibited by the Company policy. (Id.)

153.   Plaintiff never turned over any tapes to Cocchiarella.  He now denies that he has any recordings of Miller and has failed to produce any recordings of Miller or Dybalski to the Company. See Plaintiff's Responses to Xcel Energy Services Inc.'s First Interrogatories to Plaintiff at p. 1 (Ex. O).

154.   In addition, when this lawsuit was first commenced, Plaintiff denied having any tapes at all.  Despite his blanket denial, Plaintiff subsequently produced an incomplete recording of a conversation with Gilbert Heller and admitted that he tape recorded Joseph Morrato. Kashawny Dep. at 167:8-168:7; see also Ex. O at p. 1.

155.   In the recordings made by Plaintiff, the employees are discussing the Company's confidential internal investigations, a violation of the Company's policy. Kashawny Dep. at 225:24-10. Indeed, these conversations were recorded the on same day (and the three days

following), of Plaintiff's disciplinary meeting on February 26, 2008. <u>See</u> Ex. O at p. 1. In each conversation, Plaintiff discussed the confidential Company matters.

156.    After Plaintiff told Cocchiarella about his recordings, Plaintiff and Cocchiarella proceeded to the room where Abboud was waiting. <u>See</u> Ex. N.

157.    Abboud stated that the purpose of the meeting was to administer positive discipline and that he would read aloud Plaintiff's Written Reminder. (<u>Id.</u>)

158.    According to the Written Reminder, Plaintiff was expected to: (i) treat all employees with dignity and respect and refrain from raising his voice or shouting at others; (ii) continue reporting to and taking work direction from Abboud and drop all demands for Dybalski to revert back to the previous organizational structure; (iii) conduct his work and communicate professionally, including working in a cooperative and respectful fashion with others; (iv) guard proprietary Company information; (v) keep the discussion confidential; and (vi) not retaliate against others who may have participated in the investigation.  Kashawny Dep. Ex. 18.

159.    As Abboud read the Reminder, Plaintiff interrupted and stated "this is not true, this is a lie."  Cocchiarella told Plaintiff the investigation results were not subject to discussion and to let Abboud finish.  <u>See</u> Ex. N.  Abboud tried to continue to read the letter when Plaintiff interrupted, "this is bullshit!"  (<u>Id.</u>)

160.    Cocchiarella told Plaintiff not to swear. (<u>Id.</u>) He immediately denied swearing, although Cocchiarella pointed out to Plaintiff that he had used the word "bullshit." (<u>Id.</u>)

161.    She then advised Plaintiff to stop interrupting. (<u>Id.</u>)

162.    Cocchiarella subsequently informed Plaintiff that the Written Reminder was to remain active for nine months, and with no further violations, it would be removed from Plaintiff's file. (<u>Id.</u>)

163.    Plaintiff's salary, benefits and title were to remain the same. Kashawny Dep. at 218:15-20.

164.    Further, at the conclusion of the meeting, Abboud told Plaintiff he could have the rest of the week off with pay, and Monday morning (March 3, 2008), Abboud would meet Plaintiff in the lobby, with his access badge, to return Plaintiff to work. (Id.)

165.    Thus, as of February 26, 2008, Plaintiff was scheduled to return to work on March 3, 2008. Kashawny Dep. at 164:16-23; 302:21-303:9.

166.    Importantly, the Company scheduled Plaintiff's return to work after his crisis suspension, after he complained about discrimination, after his allegations of financial improprieties, and after his workplace threat. Kashawny Dep. at 164:16-23; 302:21-303:9.

167.    When Plaintiff's meeting with Abboud and Cocchiarella was over, Abboud went back to his office, and Cocchiarella began escorting Plaintiff to the lobby to leave. See Ex. N.

168.    As Cocchiarella and Plaintiff entered the elevator, Plaintiff told Cocchiarella, these people are "trying to screw me." Cocchiarella Dep. at 215:17-216:1. Cocchiarella did not respond to Plaintiff's comment. See Ex. N.

169.    Once the elevator doors closed, Plaintiff said again, "Chris, these people keep trying to screw me." See Ex. N. And as he made that statement, he made an obscene gesture simulating a sexual act with his rear. (Id.); Cocchiarella Dep. at 215:17-216:1; 216:15-18.

170.    Cocchiarella told Plaintiff to "stop it" that it was highly inappropriate behavior, and that he needed to "modify his behavior starting right now." See Ex. N. Cocchiarella told Plaintiff "do not make such gestures in our workplace now or in the future."

171.    Immediately after the elevator ride, Cocchiarella returned to her office and recorded the day's events. Cocchiarella Dep. at 5:17-25; see Ex. N.

172.    Cocchiarella also contacted Ed Lutz, VP of Workforce Relations and reported Plaintiff's behavior. Cocchiarella Dep. at 30:12-15.

173.    Lutz then contacted Valorie Vasquez, who was the former Director of Human Resources Business Consulting, and requested that she investigate Plaintiff's behavior of that day.  See email from Ed Lutz to Valorie Vasquez dated February 26, 2008 (Ex. Q).

**Investigation into Plaintiff's Conduct on February 26, 2008**

174.    Lutz choose to have Vasquez conduct the investigation because Vasquez was an independent investigator who was not connected with Cocchiarella, Miller, or workforce relations in her current position.  Cocchiarella Dep. at 29:7-30:3.

175.    Vasquez immediately commenced her investigation the same day, February 26, 2008, and completed her investigation within three days.  See Cocchiarella Dep. Ex. 27.

176.    During the course of the investigation, Plaintiff admitted calling Dybalski a liar and using the term "bullshit" in his disciplinary meeting. (Id.)

177.    On February 28, 2008, Vasquez sent her report to Ed Lutz.  Vasquez determined: (1) Plaintiff's conduct in the February 26, 2008 disciplinary meeting violated Company policy and his just issued Written Reminder; (2) Plaintiff violated the Company's policy prohibiting electronic recording even after being specifically warned about the prohibition; and (3) Plaintiff's conduct in the elevator with Cocchiarella also violated Company policy. (Id.)

178.    Vasquez recommended Plaintiff's employment be terminated. (Id.)

**Plaintiff's Termination**

179.    As of February 28, 2009, the recommendation to terminate Plaintiff's employment was accepted, and the decision to terminate Plaintiff's employment was made. Dybalski Dep. at 91:9-93:15.

180.    Plaintiff's termination came as a result of his conduct on February 26, 2008, as well as his violation of the Company's policy on recordings. See Ex. R.

181.    On March 3, 2008, Plaintiff was fired. Kashawny Dep. at 302:21-303:9.

182.    Notably, Plaintiff's position was filled by Ramsay Sawaya, an Arab American (whose hire was approved by Dybalski). Kashawny Dep. at 279:23-280:14; Affidavit from Dybalski ("Dybalski Aff.") (Ex. R) at ¶ 7.   In addition, Dybalski has five employees that report directly to him. They are Oswald, Abboud, Heller, Jannell Marks, and Christine Carter. All five of these individuals are in protected classes: Oswald is gay, Abboud is an Arab-American, and Jannell Marks and Christine Carter are women. All five are over age forty.  Dybalski Aff. at ¶ 6.

**EEOC Charges of Discrimination**

183.    On January 29, 2008, when Plaintiff was out of work on crisis suspension, he filed his first Charge of Discrimination with the EEOC. Plaintiff claimed he was subjected to sexual harassment and harassment based on his religion and national origin. Plaintiff also alleged that after he complained to the Company on January 3, 2008, he was suspended in retaliation for his complaints. Kashawny Dep. Ex. 8.

184.    April 4, 2007 is 300 days prior to January 29, 2008.

185.    On June 10, 2008, Plaintiff filed a Second Charge of Discrimination with the EEOC. Plaintiff claimed that he had been disciplined and terminated as a result of his religion and national origin, as well as in retaliation for his complaints of discrimination and harassment in January, 2008. Kashawny Dep. Ex. 35.

**Plaintiff's Emotional Distress Claim**

186.    Despite what Plaintiff allegedly endured at the hands of the Defendants, he testified that his job performance was never impacted. Kashawny Dep. at 107:18-108:10. Rather,

Plaintiff testified that he never missed any time from work and that there was never a time when he was not able to do his best work. Kashawny Dep. at 107:14-20.

187.    Plaintiff specifically testified that there was never a day, a time or a period that Plaintiff felt he could not perform in his job because of what was allegedly done to him. Kashawny Dep. at 107:21-108:10.

188.    Consistent with Plaintiff's admission that he was unaffected, Plaintiff has never seen a doctor or any health care provider for his emotional distress. Kashawny Dep. at 332:2-7.

189.    In addition, Plaintiff claims he has never received any type of diagnosis from any mental health provider. Kashawny Dep. at 337:7-18.

**The Lawsuit**

190.    Plaintiff filed a Complaint on December 4, 2008. Docket No. 1.

191.    On January 30, 2009, the Company filed a Motion to Dismiss Plaintiff's First and Sixth Claims for Relief. Docket No. 15. The Company answered the remaining claims. Docket No. 14.

192.    On March 6, 2009 the Company and Plaintiff entered into a joint stipulation clarifying the allegations of each of Plaintiff's seven claims for relief. See Docket No. 32. The same day, the Company withdrew its Motion to Dismiss Plaintiff's First and Sixth Claims for Relief. Docket No. 33.

193.    On March 9, 2009, Abboud, Dybalski and Oswald filed a Motion to Dismiss Plaintiff's Seventh Claim for Relief. The Motion to Dismiss was fully briefed as of May 14, 2009.  Docket Nos. 35, 39 and 43.  The Court has not ruled on that Motion.

<u>**ARGUMENT**</u>

**I.    STANDARD OF REVIEW**

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."  <u>Bausman v. Interstate Brands Corp.</u>, 252 F.3d 1111, 1115 (10th Cir. 2001). Then, "[t]o avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." <u>Id.</u>

**II.    PLAINTIFF'S NATIONAL ORIGIN/RELIGIOUS HOSTILE WORK ENVIRONMENT CLAIM FAILS; IT IS TIME-BARRED AND DOES NOT MEET THE REQUIREMENTS OF "HOSTILE."**

**A.    Plaintiff's Hostile Work Environment Claim is Time-Barred.**

**1.    <u>Plaintiff's Claim is Discrete – Now Untimely – Acts.</u>**

Plaintiff's claim for national origin/religious hostile work environment is based on alleged derogatory comments. (Am. Compl. at ¶¶  9, 11, 15-17.) Specifically, Plaintiff alleges that: (1) during a Company dinner in the Fall of 2002, Tom Imbler made racist comments (Am. Compl. at ¶ 9); (2) Plaintiff complained about those comments a couple months later (Am. Compl. at ¶ 11); and (3) "Since the Fall of 2002," Dybalski, Abboud, and Oswald also made racist and discriminatory comments [no dates specified] (Am. Compl. at ¶¶ 15-17).

The United States Supreme Court has held: "each incident of discrimination … constitutes a separate actionable unlawful employment practice." <u>National R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 114 (2002). And "each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the … 300-day

time period after … act occurred." Id. at 113. "Discrete discriminatory acts are not actionable if time barred." Id.; Haynes v. Level 3 Commc'ns, 456 F.3d 1215, 1222 (10th Cir. 2006).

Each of the remarks alleged here was a discrete act, and thus, separately actionable. See Idahosa v. Nord Cleaning Services, Inc., 2008 WL 5111197 at *6 (C.D. Ill., December 03, 2008) ("each racial comment was a discrete act of discrimination which required a filing of an administrative charge with the EEOC within 300 days of the comment") (Ex. S). Plaintiff was therefore required to file a separate EEOC charge within 300 days of each alleged comment. Plaintiff filed his charge of discrimination on January 29, 2008. Accordingly, only comments that occurred within 300 days of January 29, 2008 (on or after April 4, 2007) are actionable.

Plaintiff, nonetheless, has failed to allege any specific instances of discrimination after April 4, 2007. (Am. Compl. at ¶¶ 9, 14-18.) By Plaintiff's own admission, he cannot point to any specific date or time when he was called a discriminatory name. SOF ¶¶ 92-95. And Plaintiff's generalized statement that derogatory comments were made "since the Fall of 2002" is legally insufficient to maintain his claim. See Bronakowski v. Boulder Valley School Dist., 549 F.Supp.2d 1269, 1278 (D. Colo. 2008).

In Bronakowski, the court granted summary judgment to an employer on the former employee's hostile work environment claim in part because the plaintiff failed to allege any specific dates of derogatory statements in support of his claim. Id. (emphasis supplied). Similarly, in Aughtry v. Richland/Lexington School Dist. 5, the court there held that "the proof of a hostile environment may not rest on general allegations of mistreatment but must be 'substantiated by accounts of specific dates, times and circumstances.'" 2009 WL 2257615, at *7 (D. S.C. July 29, 2009) (Ex. T). In that case, the court found that the plaintiff's evidence of a "hostile environment" was too general in nature and, at most, established an unpleasant working

environment, not a hostile work environment.  Id.  In addition, in Carter v. Ball, III, the Fourth Circuit held that where allegations are "not substantiated by accounts of specific dates, times or circumstances . . . [s]uch general allegations do not suffice to establish an actionable claim of harassment."  33 F.3d 450, 461-62 (4th Cir. 1994).  Finally, in Nettle v. Central Oklahoma American Indian Health Council, Inc., the Tenth Circuit held, "[i]ncidents spread out over many years, and which indicate mostly poor taste and lack of professionalism, do not rise to the level of a hostile work environment."  334 Fed. Appx. 914, 924 (10th Cir. 2009) (no specific dates alleged). Thus, Plaintiff's hostile work environment claim should be dismissed.

### 2.  Plaintiff Cannot Identify a Related Act Within the Relevant Period.

To maintain a hostile work environment claim based on a series of events that occurred prior to April 4, 2007 –Plaintiff must show that those prior events were "related by type, frequency, and perpetrator" to one or more acts that occurred after April 4, 2007. Duncan v. Mgr., Dept. of Safety, 397 F.3d 1300, 1309 (10th Cir. 2005) (emphasis added); Morgan, 536 U.S. at 122 (hostile work environment claims are viable only if "all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period."); Ruffino v. State Street Bank & Trust Co., 908 F. Supp. 1019, 1039-40 (D. Mass. 1995) (dismissing hostile environment claim because plaintiff "has not alleged with any specificity that others' misconduct, which contributed to a hostile, offensive, and abusive work environment, continued into the limitations period") (emphasis added).

As set forth above, Plaintiff fails to allege any specific event that occurred after April 2007. (Am. Compl. at ¶¶ 15-17 (dates and conduct not specified)); SOF ¶¶ 93-95 (unable to identify any specific occurrence or date). Plaintiff only alleges a 2002 dinner, and derogatory

comments made during staff meetings he attended up to February 2007. Both of these events, however, are outside the actionable time period.

    a.    <u>The 2002 dinner is not related to "timely occurrences" if any.</u>

Plaintiff's allegation that comments were made at a 2002 dinner are unrelated to his generalized allegations of conduct occurring after that date ("Since the fall of 2002," Dybalski, Abboud, and Oswald made racist and discriminatory comments (Am. Compl. at ¶¶ 15-17)). Plaintiff specifically alleges that the perpetrator at the 2002 dinner was <u>Tom Imbler</u>, who allegedly told Plaintiff he hates immigrants. SOF ¶ 63. All of Plaintiff's allegations regarding subsequent comments, however, are directed at Dybalski, Abboud, and Oswald. (Am. Compl. at ¶¶ 15-17). Thus, the 2002 dinner is not "part of the same" alleged unlawful employment practice. <u>Duncan</u>, 397 F.3d at 1309 (prior events must be "related by type, frequency, <u>and</u> perpetrator") (emphasis supplied). Any claim based on the 2002 dinner is thus time barred and not related to alleged comments made after April 4, 2007 (if any).

    b.    <u>Comments in staff meetings are not actionable.</u>

All of Plaintiff's allegations regarding alleged comments made at Dybalski's staff meetings are similarly time barred. Plaintiff alleges that he was called derogatory names during Dybalski's staff meetings. Kashawny Dep. at 72:23-74:5. Beginning in February 2007 (after the reorganization), however, Plaintiff was no longer part of Dybalski's staff, and did not attend staff meetings. SOF ¶ 27. Thus, any comments made in these meetings were before April 4, 2007, and time barred.

**B.    Plaintiff Cannot Establish There Was an Actionable (Hostile) Environment.**

Even if Plaintiff's hostile work environment claim is not time-barred, Plaintiff's claim fails because he cannot demonstrate that a hostile work environment existed.

To survive summary judgment on a claim alleging a racially hostile work environment, "a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Jackson v. City and County of Denver, 628 F.Supp.2d 1275, 1300 (D. Colo. 2008). Plaintiff "must also produce evidence from which a rational jury could infer that []he was targeted for harassment because of h[is] national origin." Id. "A pervasively hostile work environment is not established by demonstrating a few isolated incidents of racial enmity or sporadic racial slurs.  Instead, there must be a steady barrage of opprobrious racial comments." Id. (citing Herrera v. Lufkin Indus., Inc., 474 F.3d 675, 680 (10th Cir. 2007)).  The "totality of the circumstances" test is the "touchstone" of the analysis of hostile work environment claims.  Jackson, 388 F.Supp.2d at 1300-01. The Court examines the record from both an objective and subjective standpoint, looking "at all the circumstances from the perspective of a reasonable person in the plaintiff's position." Herrera, 474 F.3d at 680.

Even when taken in the light most favorable to Plaintiff, the facts cannot reasonably support a finding that his work environment was charged with animus toward Plaintiff's national origin or religion. See Harsco Corp. v. Renner, 475 F.3d 1179, 1187 (10th Cir. 2007) (factors to consider in evaluating whether the environment is hostile or abusive include: "the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."). As described below, Defendants did not harbor racial or religious animus towards Plaintiff, and the alleged conduct never interfered with Plaintiff's work performance.

**1.     The Alleged Harassment Did Not Alter Terms or Conditions of Plaintiff's Employment.**

Taking Plaintiff's allegations as true, Plaintiff's claim still fails. He cannot show that any of the behavior alleged was pervasive or severe enough to alter the terms, conditions, or privilege of his employment. Davis v. U.S. Postal Service, 142 F.3d 1334, 1341 (10th Cir. 1998). Plaintiff admits that he took several of the alleged comments in jest and knew that they were meant as jokes. SOF ¶¶ 16-17. See Nettle, 334 Fed. Appx. at 924 ("Where comments are made in jest and the plaintiff recognizes them as such, unless they are of unusual pervasiveness or severity, they cannot ordinarily be regarded as having altered the conditions of the victim's employment and created an abusive working environment."). Further, Plaintiff admits that the alleged comments did not affect his ability to work. Plaintiff testified that there was never a day, a time or a period that he felt he could not perform in his job because of what supposedly was occurring at the hands of the Defendants. SOF ¶¶ 186-87. He also testified that he never missed any work and there was never a time when he was unable to do his best work. Id. Finally, Plaintiff admits that he never suffered any demotion, pay cut, or cut in benefits. SOF ¶¶ 9, 31-32.

## 2. There is No Evidence That Plaintiff Was Targeted *Because of* National Origin or Religion.

Plaintiff also cannot show that he was targeted for harassment because of his national origin or religion. Jackson, 628 F.Supp.2d at 1300 (Plaintiff "must also produce evidence from which a rational jury could infer that [he] was targeted for harassment because of his . . . national origin."). Plaintiff's friend, Heller, testified that the general atmosphere was childish and that the Individual Defendants joked around with everyone. SOF ¶ 18. And Plaintiff testified that Heller (a Caucasian male) was actually the target of several comments. SOF ¶ 87. Another employee, Kathy Leising, also testified that jokes were played on Abboud. SOF ¶ 19. The "totality of the circumstances test is the touchstone of the analysis of hostile work environment claims."

Jackson, 628 F.Supp.2d at 1300-01. Here, the totality of the circumstances shows that while there may have been banter, Plaintiff was not targeted because of his national origin or religion.

In Bolden v. PRC, Inc., an African American plaintiff was subjected to a work environment that included the following occurrences: a co-worker warned the plaintiff to be careful "because we know people in [the] Ku Klux Klan; the words "honky" and "nigger" were used in the plaintiff's presence; a co-worker drew a sad face cartoon with the title "Junior makes the same pay as I do"; the co-worker was called a "dickhead," "dumbshit," "asshole," "faggot," and "fool"; his chair was rigged so the back would fall off; and he was violently pushed.  43 F.3d 545, 549 (10th Cir. 1994). The plaintiff testified that the work environment had a "joking" atmosphere, and many of the workers harassed one another and were the recipient of jokes. Id. at 551. The Tenth Circuit found "[t]he derisive environment in the workshop was universal" and the plaintiff's claim for hostile work environment racial harassment failed because "he [had] not shown he was singled out for abuse and has not shown the ridicule he faced stemmed from racial animus." Id. Similarly, there is no evidence here that supports a reasonable inference that the acts about which Plaintiff complains occurred because of his national origin or religion.

Indeed, the undisputed evidence shows that neither the Company nor the Individual Defendants even knew Plaintiff's religion. While Plaintiff claims that he was targeted for harassment because of his religion, he also admits that no one knew his religion due to his own efforts to conceal it.  SOF ¶¶ 90, 96-97. Plaintiff testified that the Company may not have known he was Arab or Muslim because: "I was a U.S. citizen.  I don't discuss religion." SOF ¶ 97. Plaintiff also testified that he would not ever talk about religion, although he made the sign of the cross in front of his co-workers. SOF ¶ 96. Plaintiff also said that he never practiced his Muslim religion outside of his home. SOF ¶ 89. Finally, Plaintiff stated in his deposition that he made

distinct efforts not to mention his religion in the workplace. SOF ¶ 90. Even Plaintiff's friend, Morrato, thought Plaintiff was agnostic. SOF ¶ 96. Because there is no evidence that anyone even knew Plaintiff's religion, he could not have been targeted because of his religion.

Furthermore, Plaintiff claims that his national origin is "Arab." Kashawny Dep. Ex. 8; Am. Compl. at ¶ 5. His definition of "Arab" American, is simply "somebody who speaks Arabic." SOF ¶ 82. Plaintiff explained that "Arab is really just a language in [his] mind. It's not a culture. It's nothing beyond a language." Id. In addition, Plaintiff explained that his first language is French. SOF ¶ 83. Further, Plaintiff's supervisor (and Defendant in this case), Abboud, is an Arab-American. In his deposition, Plaintiff stated that he and Abboud are, to his knowledge, the only Arab-Americans at the Company. SOF ¶ 85. Plaintiff states that, nonetheless, he never saw Abboud harassed or discriminated against, and never saw Oswald or Dybalski do or say anything inappropriate to Abboud. SOF ¶¶ 85-86. Viewing the totality of the circumstances through an objective lens, had Plaintiff been targeted because he was "Arab," so too would Abboud have been targeted. Yet, Plaintiff admits that Abboud was not targeted at all. SOF ¶ 86. Plaintiff, therefore, could not have been targeted because he is "Arab."

Moreover, several comments Plaintiff alleges are completely unrelated to any religion or national origin. For example, Plaintiff's allegation that he was called goat herder has no relation to being either Muslim or Arab-American. SOF ¶ 65. Plaintiff admitted that goats are not associated with any particular part of the world, and goats are not associated with any particular religion. (Id.) In addition, Plaintiff admits that comparing his physical looks to the President of Iran is actually not related to Plaintiff's religion or national origin. SOF ¶ 70.

### 3. Plaintiff's Vague Allegations are Insufficient to Support His Claim.

Plaintiff's hostile work environment claim fails for another reason as well. He cannot point to any specific date of any of his alleged (and timely) comments. SOF ¶¶ 92-95. The fact that Plaintiff cannot pinpoint any particular instance (other than a time-barred 2002 dinner) is fatal to Plaintiff's hostile work environment claim. See Bronakowski, 549 F.Supp.2d at 1278 (granting summary judgment to employer in part because plaintiff failed to allege specific dates of statements in support of hostile work environment claim); Aughtry, 2009 WL 2257615, at *7 ("proof of a hostile environment may not rest on general allegations of mistreatment but must be 'substantiated by accounts of specific dates, times and circumstances.'"); Carter, 33 F.3d at 461-62 (where allegations "not substantiated by accounts of specific dates, times or circumstances . . . [court held] [s]uch general allegations do not suffice to establish an actionable claim of harassment."); Lenoir, 841 F.Supp. at 1462 (plaintiff's vague allegations without reference to exact dates insufficient to support harassment claim).

### 4.       Plaintiff's Claim Fails Under the Totality of the Circumstances.

The "totality of the circumstances" test is the "touchstone" of the analysis of hostile work environment claims. Jackson, 388 F.Supp.2d at 1300-01. Under the totality of the circumstances, Plaintiff's claim fails.  Based on his own conduct at work viewed from both an objective and subjective standpoint, no reasonable juror could find that Plaintiff's work environment was permeated with discriminatory intimidation, ridicule, and insult, sufficiently severe or pervasive to alter the conditions of his employment.

Here, Plaintiff did not complain until January 2008, when his resentment and anger toward Dybalski for not promoting him boiled over and Plaintiff threatened to "take the Company down."  See Holmes v. Utah Dept. of Workforce Servs., 483 F.3d 1057, 1065 (10th Cir. 2007) (employee waiting several months to report harassing incident "raises a question as to

the severity of the incident as perceived by the employee"). The facts also show that Plaintiff had multiple interactions with individuals from human resources over the years. SOF ¶¶ 79-80. He had ample opportunity to bring this alleged harassment to the Company's attention. If Plaintiff were truly disturbed by his treatment, his claims would have been raised. Despite these interactions, Plaintiff never complained about any of the Individual Defendants, about inappropriate conduct, or derogatory comments.

Still further, each year, all employees, managers and officers are required to complete compliance training via online courses. SOF ¶ 76. This training includes an annual review of the Code of Conduct. (Id.) Plaintiff admitted that while he was aware of the Company's 1-800 number, Alert line, for internal complaints, he never attempted to use it. SOF ¶¶ 73-74. In addition, Plaintiff admitted that, as a manager, he was required to familiarize himself with the company policies so he could always follow them.  SOF ¶¶ 75-78.

## III.   PLAINTIFF'S SEXUAL HARASSMENT CLAIM ALSO FAILS.

Plaintiff's claim for sexual harassment fails for three reasons: (1) the alleged harassment did not alter the terms or conditions of Plaintiff's employment; (2) the alleged harassment was not "severe"; and (3) Plaintiff cannot identify a basis to hold the Company liable.

A claim for sexual harassment has five major elements that must be proven by a plaintiff: (i) that he was exposed to workplace conduct that was offensive, ridiculing, or harassing; (ii) that such conduct was sufficiently severe or pervasive as to alter the terms and conditions of employment; (iii) that such conduct was unwelcome; (iv) that such conduct was because of his sex; and (v) there is some recognized predicate for the employer's liability for the harassment. See generally Turnbull v. Topeka State Hosp., 255 F.3d 1238, 1243 (10th Cir. 2001) (relating to severity elements); Dick v. Phone Directories Co., 397 F.3d 1256, 1262-63 (10th Cir. 2005)

(relating to "because of sex" element); <u>Anderson v. Wintco, Inc.</u>, 314 Fed. Appx. 135, 138 (10th Cir. 2009) (unpublished) (relating to employer liability).

Severity is assessed from both the employee's subjective perspective, as well as from the objective perspective of a reasonable employee in the same circumstances. <u>Farragher v. City of Boca Raton</u>, 524 U.S. 775, 787 (1998). In determining whether harassing workplace conduct is sufficiently severe or pervasive, the Court considers all of the surrounding circumstances, including "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance." <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 21-22 (1993). The severity standard is intended to be "sufficiently demanding to ensure that Title VII does not become a 'general civility code'." <u>Farragher</u>, 524 U.S. at 788. Thus, "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" will not rise to an actionable level, nor will "the ordinary tribulations of the workplace, such as sporadic use of abusive language, gender-related jokes, and occasional teasing." <u>Id.</u>

### A.   Plaintiff Cannot Establish The Alleged Harassment Was Sufficiently Severe or Pervasive To Alter the Terms and Conditions of His Employment.

The fundamental principal of any sexual harassment claim is that harassment becomes actionably severe when it serves to alter the terms and conditions of employment. <u>Harris</u>, 510 U.S. at 21-22. The key inquiry is whether Oswald's conduct objectively and subjectively interfered with Plaintiff's ability to continue to do his job.  <u>Turnbull</u>, 255 F.3d at 1243.

### 1.   <u>Plaintiff was not affected in his ability to do his job.</u>

By Plaintiff's own admission, his ability to work was unimpeded by Oswald's alleged harassment. Plaintiff testified that he never missed any time from work, there was never a time when he was not able to do his best work (SOF ¶ 186), and there was never a day that Plaintiff

could not perform because of what was (allegedly) being done to him. SOF ¶ 187. Accordingly, Plaintiff cannot claim that incidents with Oswald affected a term, privilege, or condition of his employment. See Flowers v. Federal Express Corp., 2008 WL 185699, at *4 (D. Colo. Jan. 18, 2008) (Ex. U) ("even if the alleged harassment was sufficiently severe and pervasive, Plaintiff has not shown how these incidents affected a term, privilege, or condition of his employment.... Plaintiff continued to perform his duties and work unimpeded by this alleged harassment until she suffered a back injury on the job ....").

### 2.   Plaintiff was neither fearful nor intimidated.

Plaintiff further testified in his that he never said a word to Oswald about the alleged groping, and that when Oswald would approach Plaintiff and grope his thigh, butt, and crotch, Plaintiff would simply "walk away" without saying a word. SOF ¶ 119. Indeed, Plaintiff made no effort to avoid the alleged "grabbing" or "gropes" and testified that he would simply look at Oswald during the alleged touching, without speaking. Id. See Flowers, 2008 WL 185699 at *3 (where plaintiff shrugged off incident and walked away, the subjective component of sexual harassment was not met – if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment) (citing Witt v. Roadway Express, 136 F.3d 1424, 1432-33 (10th Cir. 1998)). Plaintiff said he also continued his interactions with Oswald, socializing with him at Company events and going to Oswald's house. SOF ¶ 113.  Thus, Plaintiff was not subjectively fearful of Oswald.

### 3.   Plaintiff's reaction to the alleged harassment undercuts his claim.

In addition, Plaintiff claims that the harassment began in 2002 or 2003, and that Oswald starting "grabbing his butt" in 2003.  SOF ¶ 110.  Plaintiff also claims that it occurred in 2004, 2005, and 2006. See Miller Dep. Ex. 49. Yet, Plaintiff never reported these alleged incidents

until 2008 when Plaintiff was under investigation for violations of the Company's workplace violence policy. SOF ¶ 110. Plaintiff's lack of reporting defeats his claim that the alleged harassment was severe. See Holmes v. Utah Dept. of Workforce Servs., 483 F.3d 1057, 1065 (10th Cir. 2007) (employee waiting several months to report harassing incident "raises a question as to the severity of the incident as perceived by the employee").

**B.    Plaintiff Cannot Identify a Basis For Imputing Liability to the  Company.**

Further, Plaintiff must also identify a basis for holding the Company - as employer - liable under Title VII. Harsco Corp. v. Renner, 475 F.3d 1179, 1186 (10th Cir. 2007). There are two ways an employer may be liable: (1) vicarious liability; or (2) for its own negligence. Plaintiff can establish neither.

**1.    The Company cannot be held vicariously liable.**

The Supreme Court has held that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee." Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807. Thus, the question in determining whether the Company may be subject to liability is whether Oswald was "a supervisor with immediate (or successively higher) authority" over Plaintiff. Ellerth, 524 U.S. at 765. Here, it is clear that Oswald was not Plaintiff's direct supervisor - Abboud was, and above Abboud, Dybalski. SOF ¶¶ 3 and 26. Plaintiff admitted in his deposition that Oswald has never been Plaintiff's supervisor at any time. SOF ¶ 4. Further, Plaintiff was in a different department. Id. Thus, there is no evidence that Oswald was in Plaintiff's chain of command, and the Company therefore cannot be held liable.

**2.    Plaintiff cannot show the Company acted unreasonably.**

In Ellerth, the Supreme Court recognized that "although a supervisor's sexual harassment is outside the scope of employment because the conduct was for personal motives, an employer can be liable, nonetheless, where its own negligence is a cause of the harassment." 524 U.S. at 759. "An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it." Id.; see also Harsco Corp., 475 F.3d at 1186 (plaintiff is "required to prove . . . that [employer] had actual or constructive knowledge of the hostile work environment but did not adequately respond to notice of the harassment."). It is Plaintiff's burden to show that the Company acted unreasonably. Hollins v. Delta Airlines, 238 F.3d 1255, 1258 (10th Cir. 2001). "[T]he focus is not on whether the employer is liable for the bad acts of others, but whether the employer itself is responsible for failing to intervene." Id.

Here, the Company cannot be held liable for failing to intervene when Plaintiff failed to report the conduct through the Company's available channels. SOF ¶ 73-80. Plaintiff admits that he was in contact with HR starting in 2002 for other issues, and that he even worked with Cocchiarella and Miller at separate times. SOF ¶¶ 79-80. For six entire years, Plaintiff never reported Oswald's alleged touching, grabbing, or comments to the human resources department. SOF ¶ 72. When Plaintiff finally did report the alleged conduct, it was because Plaintiff was already under investigation himself for violating Company policy. Miller Dep. Ex. 49.

And, as soon as the Company was informed of the alleged conduct by Plaintiff's complaint on January 7, 2008, the Company took reasonable steps to investigate the matter and stop the alleged behavior. The Company promptly investigated Plaintiff's allegations (SOF ¶¶ 61-62; 125-140), and Oswald was issued an Oral Reminder for alleged inappropriate touching.[4]

---

[4] Plaintiff never made any internal allegations to Miller that Oswald touched his groin, or "grabbed" or "groped" his butt or groin. Plaintiff's allegations regarding his groin area or crotch area did not appear until Kashawny's deposition in this case. See Miller Dep. at 132:16-134:2. Thus, the Company's internal investigation was only

Cocchiarella Dep. Ex. 10. Plaintiff cannot now attempt to hold the Company responsible. It is Plaintiff's burden to show the Company acted unreasonably; he cannot make this showing.

## IV.     PLAINTIFF'S CLAIMS FOR RETALIATION FAIL AS A MATTER OF LAW.

Title VII, 42 U.S.C. § 2000e-3(a), and 42 U.S.C. §1981 make it unlawful for an employer to retaliate against an employee for opposing the employer's discriminatory practices. To state a *prima facie* case of retaliation, Plaintiff must show three things: (i) he engaged in protected opposition to discrimination; (ii) he suffered an adverse employment action; and (iii) there is a causal connection between the protected activity and the adverse employment action. See Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1202 (10th Cir. 2006).

As the basis for his retaliation claim, Plaintiff alleges that he engaged in protected opposition to discrimination when he complained to Human Resources on January 3, 2008. See Kashawny Dep. Ex. 8. Plaintiff alleges "as a result and in retaliation for complaining, I was suspended indefinitely." Id. In Plaintiff's second Charge of Discrimination, he alleges that his discipline on February 26, 2008, and his termination on March 3, 2008, "were retaliations" for his January 3, 2008 complaint to human resources as well. Kashawny Dep. Ex. 35. Thus, Plaintiff alleges three distinct employment actions were in retaliation for his January 3, 2008, complaint: (1) his January 4, 2008, crisis suspension; (2) his February 26, 2008 Written Warning, and; (3) his termination from employment on March 3, 2008.

Here, Plaintiff cannot establish that his suspension or discipline were adverse employment actions under the law. Thus, the inquiry ends at the second element of Plaintiff's claim. With respect to his termination from employment, Plaintiff cannot establish – at least –

---

related to Kashawny's allegations that Oswald slapped Kashawny's butt and put his hand on Kashawny's leg, which were the only allegations made to the Company.  See Cocchierella Dep. Ex. 6, at pp. 11-12; see also Miller Dep. Ex.. 49.

that there was any causal connection between his January 3, 2008 complaint, and his March 3, 2008, termination. Plaintiff also cannot establish that the Company's reasons for ending Plaintiff's employment – Plaintiff's misconduct before, during, and after his disciplinary meeting, and Plaintiff's admission that he tape recorded Company matters in violation of Company policy – are pretext. Accordingly, Plaintiff's claims for retaliation fail.

### A.   Plaintiff's Suspension Was Not an Adverse Employment Action.

Plaintiff was placed on crisis suspension the day immediately after he threatened to "take down" the Company. SOF ¶ 58. Plaintiff's statement was a potential violation of the Company's workplace violence policy, and Plaintiff was suspended for that reason alone. During his suspension, Plaintiff was paid his regular salary and benefits. SOF ¶ 60.

The law provides that only "acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits" will rise to the level of an adverse employment action. Haynes, 456 F.3d at 1222; see also Piercy v. Maketa, 480 F.3d 1192, 1203 (10th Cir. 2007). Courts therefore have held that when an employee is placed on paid suspension pending an investigation, it does not constitute an adverse employment action for purposes of Title VII or 42 U.S.C. § 1981.  See Nichols v. Southern Illinois University-Edwardsville, 510 F.3d 772, 786-87 (7th Cir. 2007) (placement of employee on paid administrative leave pending the conclusion of an investigation does not constitute an adverse action) (collecting cases holding same); Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 594 (6th Cir. 2007) (administrative leave pending investigation did not constitute adverse action); Joseph v. Leavitt, 465 F.3d 85, 92-93 &  n.1 (2d Cir. 2006) (five-month paid suspension did not constitute adverse action where the employer simply applied reasonable disciplinary

procedures and acted with reasonable diligence in conducting its investigation into accusations); Singletary v. Mo. Dep't of Corrs., 423 F.3d 886, 891-92 (8th Cir. 2005) (no materially adverse action when employer placed employee on leave pending a departmental investigation).

### B. Plaintiff's Written Warning Was Not an Adverse Employment Action Either.

The Company's internal investigation into Plaintiff's threat to take the Company down resulted in a finding that Plaintiff more likely than not made the statement. SOF ¶¶ 133-34. The investigation also concluded that Plaintiff acted inappropriately and unprofessionally by yelling at his superior Dybalski.  (Ex. L.) As a result, Plaintiff was issued a written warning. The warning was to stay in Plaintiff's file for nine months, but did not alter the terms or conditions of Plaintiff's employment with the Company. SOF ¶ 162. Plaintiff was to keep his position as a Director, and his salary and benefits remained unchanged. SOF ¶ 163.

Plaintiff claims that his written warning was in retaliation for his complaints of discrimination on January 3, 2008. This Circuit has held, however, unless a written warning effects a significant change in the plaintiff's employment status, it is not an adverse employment action sufficient to state a *prima facie* claim for retaliation. Haynes, 456 F.3d at 1224 ("[A] written warning is an adverse employment action 'only if it effects a significant change in the plaintiff's employment status.'"). Here, there is no evidence that Plaintiff's written warning effected any change in his employment status.  In fact, Plaintiff was to be reinstated to his same position, same title, same salary, and same benefits despite the written warning. SOF ¶ 163. Further, a number of Tenth Circuit decisions have found that, although disciplinary notices can constitute adverse employment actions, a single notice that chastises an employee for some particular action and threatens increased discipline in the future, without more, does not rise to the level of an adverse action sufficient to support a retaliation claim. See e.g. Medina v. Income

Support Div., 413 F.3d 1131, 1137 (10th Cir. 2005) (a reprimand "will only constitute an adverse employment action if it ... affects the likelihood that the plaintiff will be terminated, undermines the plaintiff's current position, or affects the plaintiff's future employment opportunities" and finding letter for making baseless allegations of workplace harassment did not rise to that level); Tapia v. City of Albuquerque, 170 Fed. Appx. 529, 535 (10th Cir. 2006) ("The fact that the letter indicates that Tapia could be disciplined for a future threat is not enough to make the letter disciplinary action"); Rennard v. Woodworker's Supply, Inc., 101 Fed. Appx. 296, 307 (10th Cir. 2004) (unpublished) ("absent evidence of any immediate consequence of the reprimands, such as ineligibility for job benefits," issuance of disciplinary notices not sufficiently adverse). Accordingly, Plaintiff's written warning was not an adverse employment action, and his claim for retaliation fails.

### C.     Plaintiff's Termination Was Not Causally Connected to His Complaint.

Plaintiff also cannot show, with respect to his allegations that the termination was retaliation, that there was a causal connection between his allegations of discrimination and his termination. (As noted above, this causal connection is the third element of Plaintiff's *prima facie* case.) "To establish the requisite causal connection between [a Plaintiff's] protected conduct and termination, [a Plaintiff] must show that [the employer] was motivated to terminate his employment by a desire to retaliate for his protected activity."  See Hinds v. Sprint/United Management Co., 523 F.3d 1187, 1203 (10th Cir. 2008).

Here, the evidence does not show that the Company was motivated to terminated Plaintiff's employment by a desire to retaliate. The evidence shows just the opposite: the Company was prepared to return Plaintiff to work on March 3, 2008 (the Monday after his disciplinary meeting). During Plaintiff's February 26, 2008, meeting, he was expressly told to

return to work on March 3rd; Plaintiff admits this fact. SOF ¶¶ 164-165. Plaintiff's inappropriate and unprofessional behavior before, during and after the February 26, 2008 meeting, as well as his voluntary admission that he recorded conversations in violation of Company policy, were the reasons Plaintiff's employment was ended. Because the Company was fully prepared to return Plaintiff to work after his complaint of discrimination, Plaintiff cannot show that the Company was motivated to terminate his employment by a desire to retaliate.

**D.      Plaintiff Also Cannot Show Pretext.**

Even if this Court determines that Plaintiff established a *prima facie* case of retaliation, the Company can prevail by articulating a legitimate nondiscriminatory reason for its action. See O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1252 (10th Cir. 2001). The Company did that by showing it investigated Plaintiff's conduct before during and after his February 26, 2008 disciplinary meeting, and determined that Plaintiff acted inappropriately and unprofessional and made lewd gestures at senior management as well as admitted to tape recording conversations in violation of Company policy. SOF ¶ 174-78. See Maston v. St. John Health System, Inc., 296 Fed. Appx. 630, 635 (10th Cir. 2008) (holding insubordination and failure to cooperate with an internal investigation is legitimate non-discriminatory reason).

Since the Company has made this showing, Plaintiff must respond by demonstrating that the Company's reasons for the adverse action are pretextual. Perry v. Woodward, 199 F.3d 1126, 1135 (10th Cir. 1999). This Court's inquiry is not whether the Company's reasons for discharging Plaintiff were "wise, fair or correct," but whether the Company "honestly believed those reasons and acted in good faith upon those beliefs." Rivera v. Denver, 365 F.3d 912, 925 (10th Cir. 2004). "It is the perception of the decision maker [that] is relevant, not plaintiff's perception of [himself]." Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir. 1988).

Plaintiff cannot prove that the Company's reasons for terminating him were pretextual. First, Valorie Vasquez was the individual who recommended terminating Plaintiff's employment after her investigation into his behavior on February 26, 2008. SOF ¶ 178. Plaintiff admitted to her that he swore in his disciplinary meeting, called his supervisor a liar, and also, admitted to tape recording conversations in violation of Company policy. Vasquez honestly believed (based on Plaintiff's admissions, among other corroborating facts), that Plaintiff should be terminated and acted in good faith in making her recommendation. Plaintiff cannot demonstrate that the reasons for recommending his termination of employment are unworthy of belief. "It is not enough to disbelieve Defendants' explanation" either. Jackson, 628 F.Supp.2d at 1299-1300. "The court may not second-guess an employer's business judgment." Id. Accordingly, Plaintiff's retaliation claim should be dismissed.

## V.  PLAINTIFF'S DISPARATE TREATMENT[5] CLAIM (UNDER TITLE VII) FAILS AS A MATTER OF LAW.

Plaintiff alleges that he was discriminated against based on his "national origin/religion" in violation of Title VII. Plaintiff's claims that his "discipline and termination on March 3, 2008, were . . . as a result of [his] national origin and religion . . . ." See Kashawny Dep. Ex. 35. As set forth in § IV.B, supra, Plaintiff's "discipline" was a written warning which had no effect on his employment status, nor did it have an effect on his salary or benefits. SOF ¶ 163. Accordingly, the "discipline" is not an adverse employment action under Title VII.

---

[5] In his Amended Complaint, Plaintiff combines his national origin and religious discrimination claims under Title VII into one cause of case titled, "National Origin/Religious Discrimination and Hostile Work Environment." It is unclear whether Plaintiff has brought separate claims for hostile work environment and disparate treatment based on national origin/religion, whether Plaintiff has brought a hostile work environment claim only, or whether Plaintiff has sought to allege four distinct claims: religious disparate treatment, national origin disparate treatment, hostile work environment based on religion, and hostile work environment based on national origin. See Am. Compl., at p. 15, ¶¶ 62-71. For purposes of this Motion, Defendants assume that Plaintiff has brought two claims for relief under Title VII: (1) national origin/religious disparate treatment; and (2) national origin/religious hostile work environment. Plaintiff's national origin/religious hostile work environment claim is discussed at § II, supra.

### A.      Plaintiff Cannot State a *Prima Facie* Case of Discriminatory Termination.

To establish a *prima facie* case of termination, Plaintiff must demonstrate that: "(1) he was a member of a protected class; (2) he was qualified and satisfactorily performing his job; and (3) he was terminated under circumstances giving rise to an inference of discrimination." Salguero v. City of Clovis, 366 F.3d 1168, 1175 (10th Cir. 2004). Here, Plaintiff cannot offer any evidence giving rise to an inference of discrimination, the third element.

The undisputed evidence shows that Plaintiff's religion was unknown to the Company. In his deposition, Plaintiff claimed that he is a Muslim, but admitted that he never wanted anyone at the Company to know, and in fact hid it from them.   SOF ¶¶ 90, 96-97. Plaintiff does not practice his Muslim religion in public, nor does he belong to (let alone attend services at) a mosque. SOF ¶ 88.  He also acts inconsistently with Muslim tenants: he drinks alcohol, shaves, and swears. SOF ¶ 91.  Plaintiff's friend, Morrato, testified that Plaintiff told him that he was agnostic.  SOF ¶ 96.  The Company could not discriminate against Plaintiff based on his religion when they did not know his religion and he actually undertook to hide it. SOF ¶¶ 90 and 96-97.

In addition, Plaintiff cannot offer any evidence that his termination was because of his national origin. In support of Plaintiff's claim, he alleges several different stray remarks over the course of his employment. SOF ¶¶ 61-64. These remarks however, are not linked to Plaintiff's termination decision. Further, Plaintiff alleges that discriminatory remarks were made on a weekly basis since 2002. (Am. Compl. ¶¶ 15-17.) The remarks cannot be linked to Plaintiff's termination when they allegedly had no impact on his continued employment for six years.

Finally, the decision-maker here, Dybalski, took Plaintiff under his wing, hired him, promoted him, gave him raises, and brought him to Denver with Dybalski. SOF ¶¶ 7-11. Then, after agreeing with HR's recommendation to terminate Plaintiff, Dybalski replaced Plaintiff with

an Arab-American, Ramsay Sawaya.  SOF ¶ 182.  Further, Sawaya's supervisor, Abboud, is Arab-American.  The fact that Plaintiff was replaced by another Arab-American defeats any inference that Plaintiff was terminated under circumstances giving rise to an inference of discrimination.

Moreover, the Company is entitled to an inference that its decision to terminate Plaintiff's employment was <u>not</u> discriminatory. As Plaintiff admits, Dybalski hired him, promoted him, and Dybalski was the final decision-maker as to Plaintiff's termination. SOF ¶ 5, 8-10.  <u>See</u> <u>Sarkar v. McCallin</u>, 2009 WL 2762731, at *9 (D. Colo., Aug. 26, 2009) (Slip Copy) ("Defendants are entitled to a presumption that the termination was non-discriminatory, since [the person] who made the decision to discharge Plaintiff, also hired Plaintiff and gave him a raise....").

### B.      Plaintiff Also Cannot Show the Company's Reasons Were Pretext.

Even if Plaintiff were able to establish a *prima facie* case of discrimination, he cannot prove the Company's reasons for terminating his employment were a pretext for discrimination. After a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's termination. <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981). If the employer sustains this burden, the plaintiff may prevail only if he can show the reasons offered by the employer were not the real reasons for his discharge, but were a pretext for discrimination. <u>Id.</u>

Here, the Company offered evidence that Plaintiff was fired for insubordination and unprofessional conduct during his February 26, 2008 disciplinary meeting and for violating Company policy by tape recording employees of the Company. SOF ¶¶ 144-178. This legitimate, nondiscriminatory reason was based on the decision maker's good faith belief when the decision was made (based on an internal investigation), and Plaintiff cannot show that the Company's

reasons for terminating his employment were not the real reasons for his discharge. See Rivera, 365 F.3d at 925 (the inquiry is not whether the company's reasons for discharging Plaintiff were "wise, fair or correct," but whether the company "honestly believed those reasons and acted in good faith upon those beliefs."); Branson, 853 F.2d at 772 ("It is the perception of the decision maker [that] is relevant, not plaintiff's perception of [himself].").

The Company was prepared to return Plaintiff to work on March 3, 2008 (the Monday after his disciplinary meeting). During Plaintiff's February 26, 2008, meeting, he was told to return to work on March 3rd. SOF ¶ 165. It was only after Plaintiff's inappropriate and unprofessional behavior before, during and after the February 26, 2008 meeting, as well as his admission that he had recorded conversations in violation of Company policy, that Plaintiff was terminated from his employment. SOF ¶ 180. Even if Plaintiff argues this reason is unfair, "[t]he court may not second-guess an employer's business judgment" in the absence of evidence that the Company's explanation is unworthy of belief.  Jackson, 628 F.Supp.2d at 1299-1300. Here, Plaintiff cannot point to any such evidence. Accordingly, Plaintiff's claim for discrimination based on national origin and religion fails as a matter of law.

## VI.     PLAINTIFF'S CLAIM UNDER 42 U.S.C. § 1981 ALSO FAILS.

Plaintiff alleges that he was discriminated against based on his race and national origin under 42 U.S.C. § 1981. This claim should be dismissed on summary judgment for several reasons: (1) discrimination based on national origin is not actionable under § 1981; (2) Plaintiff's "race" is Caucasian through his own admission; and (3) Plaintiff's allegations depend solely on his place of birth (Morocco), and not Plaintiff's characteristics as an "Arab-American."

### A.     National Origin Discrimination Is Not Actionable Under 42 U.S.C. § 1981.

Plaintiff's claim for national origin discrimination should be dismissed because 42 U.S.C. § 1981 does not actually protect against national origin discrimination. <u>Aramburu v. Boeing Co.</u>, 112 F.3d 1398, 1411 fn.10 (10th Cir. 1997) ("Section 1981 does not protect individuals from discrimination based on national origin.").

### B.        Plaintiff's Race Discrimination Claim Fails As A Matter Of Law.

In the Complaint, Plaintiff's attorney argues that Plaintiff is an "Arab-American" which in some cases, is sufficient to maintain a claim for race discrimination under 42 U.S.C. § 1981. On the issue of whether an Arab-American has stated a claim for race discrimination under 42 U.S.C. § 1981, the United States Supreme Court has held:

> If respondent on remand can prove that he was subjected to intentional discrimination based on the fact that he was born an Arab, rather than solely on the place or nation of his origin, or his religion, he will have made out a case under § 1981.

<u>See</u> <u>Saint Francis College v. Al-Khazraji</u>, 481 U.S. 604, 6013 (1987). Thus, according to <u>Al-Khazraji</u>, if Plaintiff can show that he was discriminated against because he "was born an Arab" rather than solely on the fact that he was born in Morocco or is Muslim, he can maintain his claim. Plaintiff cannot make the required showing.

Here, Plaintiff's does not contend that he was discriminated against because his was "born Arab" (as Abboud, and Kashawny's replacement, Sawaya, were also born Arab (SOF ¶¶ 3 and 182)). Rather, the basis of Plaintiff's claim is that he is <u>Moroccan</u>. In his deposition, Plaintiff admitted that he does not view himself as any race other than either Moroccan or Caucasian. SOF ¶ 81. Moroccan, however, is not a "race," or protected category under 42 U.S.C. § 1981. <u>See</u> <u>Kun v. Finnegan, Henderson, Farabow, Garrett & Dunner</u>, 949 F.Supp. 13 (D.D.C. 1996) (citing <u>Espinoza v. Farah Mfg. Co.</u>, 414 U.S. 86 (1973) (holding that allegations of race

discrimination are not relevant to a claim of national origin discrimination, especially where the employee failed to allege his particular race)).

Further, Plaintiff defines an Arab-American as "somebody who speaks Arabic." SOF ¶ 82. He also testified: "Arab is really just a language in my mind. It's not a culture. It's nothing beyond a language." SOF ¶ 82. Further separating himself from Arab-Americans, Plaintiff's primary language is French and has never used Arabic as his primary language. SOF ¶ 83.

Finally, on top of denying under oath that he identifies as anything other than Caucasian or Moroccan, Plaintiff testified that that the Company may not have known he was Arab or Muslim because: "I was a U.S. citizen. I don't discuss religion. Like I said, I try to fit in. When I go out, I do exactly what any Christian American does. I am totally American. I love the United States. . . I always thought myself as an American." SOF ¶ 97. Since the very basis of Plaintiff's claim is that he was discriminated against because he is Moroccan, Plaintiff's claim for race discrimination under 42 U.S.C. § 1981 fails.[6]

## VII.  PLAINTIFF'S CLAIM FOR WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY FAILS AS A MATTER OF LAW.

In order to state a claim for wrongful discharge in violation of public policy, Plaintiff must prove: (1) that the employer directed the employee to perform an illegal act as part of the employee's work related duties or prohibited the employee from performing a public duty or exercising an important job-related right or privilege; (2) that the action directed by the employer would violate a specific statute relating to the public health, safety, or welfare, or would undermine a clearly expressed public policy relating to the employee's basic responsibility as a

---

[6] Even if this Court determines that Plaintiff can maintain a claim for "race" discrimination under 42 U.S.C. § 1981 based on his naked allegation that his is an "Arab-American" despite his deposition testimony to the contrary, Plaintiff's claim still fails for the reasons set forth in § V, supra.  See Carney v. City and County of Denver, 534 F.3d 1269, 1273 (10th Cir. 2008) ("The elements of a claim of race discrimination are the same under both Title VII and § 1981.").

citizen or the employee's right or privilege as a worker; (3) that the employee was terminated as a result of refusing to perform the act directed by the employer; and (4) the employer was aware, or reasonably should have been aware, that the employee's refusal to comply was based on the employee's reasonable belief that the action ordered by the employer was illegal, contrary to clearly expressed statutory policy relating to the employee's duty as a citizen, or violative of the employee's legal right or privilege as a worker. See Martin Marietta Corp. v. Lorenz, 823 P.2d 100, 109 (Colo. 1992); see also Caspar v. Lucent Technologies, Inc., 280 F.Supp.2d 1246, 1249 (D. Colo. 2003). Plaintiff cannot show any of these four elements.[7]

First, Plaintiff does not claim that the Company directed him to perform an illegal act or prohibited him from performing a public duty or exercising an important job-related right or privilege. In fact, Plaintiff admitted that he did not complain about what he allegedly "saw" at the Company with respect to his allegations of financial improprieties: "for the simple reason that I don't have any facts" and "I don't have any proof of illegal activity." SOF ¶¶ 105 and 109. And, Plaintiff never complained to anyone that he thought the Company was requiring him to perform an illegal act, an element of the claim. SOF ¶¶ 106-108.

When pressed for details about the alleged improprieties, Plaintiff did not have any specific information or evidence of any improper transactions, and could not point to any particular wrongdoing. SOF ¶ 105. Further, Plaintiff admitted that he never went to the Attorney General's office to complain about anything he saw in the workplace, nor did he ever go to any governmental agency, including the PUC, or any other specific agency to report the alleged conduct. SOF ¶ 106-07. Plaintiff also admitted that even after he was fired from the Company, he still did not report any wrongdoing by the Company. SOF ¶ 108. The reason: Plaintiff did not

---

[7] Here, the facts Plaintiff alleges with respect to his wrongful discharge claim are explicitly limited by the Joint Stipulation of the parties filed with the Court on March 6, 2009 (Docket No. 32).

have any facts regarding any of his allegations. SOF ¶ 109.  Plaintiff was simply making noise with baseless allegations in order to take the attention off of himself for threatening the Company.  Next, since the Company did not direct Plaintiff to perform any illegal act (and Plaintiff admitted in his deposition that he was not aware of any illegal activity, SOF ¶ 105), there is no "action directed by the employer," as required by the second element.

With respect to the third element, Plaintiff cannot show that he was terminated for his failure to perform an illegal act – as Plaintiff never refused to perform any acts directed by the Company because the acts were illegal.

In addition, Plaintiff has offered no evidence connecting his allegations of financial improprieties to his termination from the Company. Like Plaintiff's complaints of discrimination, his allegations of financial improprieties were made in January 2008. Up until February 28, 2008, however, the Company fully intended Plaintiff to continue working at the Company (notwithstanding his financial allegations). SOF ¶¶ 143, 148, 149, 164 and 165. The undisputed fact that the Company planned to return Plaintiff to work on March 3, 2008 until he acted unprofessionally in his disciplinary meeting, defeats any claim that Plaintiff  was terminated as a result of refusing to perform illegal acts or complaining to the Company.

Finally, with respect to the fourth element of his claim, Plaintiff never refused to perform an illegal act. Thus, the Company did not know, nor should have known, that Plaintiff's refusal (because there was no refusal) was based on a belief that the act was illegal. Because Plaintiff cannot prove any element, summary judgment should enter in favor of the Company.

## VIII.   PLAINTIFF'S   OUTRAGEOUS   CONDUCT   CLAIM   AGAINST   THE INDIVIDUAL DEFENDANTS FAILS AS A MATTER OF LAW.[8]

---

[8] Plaintiff's Seventh Claim for Relief for Outrageous Conduct was not asserted against the Company.  (See Am. Compl., p 20, ¶¶ 104-108.)

**A.      The Defendants Incorporate The Arguments Set Forth in The Individual Defendants' Motion To Dismiss and Reply Brief (Docket Nos. 35 and 43).**

The Individual Defendants filed a Motion to Dismiss Plaintiff's Seventh Claim for Relief for Outrageous Conduct on March 9, 2009, and the motion was fully briefed on May 14, 2009. The Court has not yet ruled. The Defendants incorporate the arguments set forth therein.

Even if the Court finds that allegations in Plaintiff's Amended Complaint are sufficient to withstand the motion to dismiss, Plaintiff cannot establish any of the elements of his claim for outrageous conduct under Fed. R. Civ. P. 56.

**B.      Plaintiff Cannot Establish the Elements of An Outrageous Conduct Claim.**

To establish a *prima facie* case of outrageous conduct, Plaintiff must show: (1) the defendants engaged in extreme and outrageous conduct; (2) the defendants engaged in the conduct recklessly or with the intent of causing the plaintiff severe emotional distress; and (3) the defendants' conduct caused plaintiff severe emotional distress. McCarty v. Kaiser-Hill Co., L.L.C., 15 P.3d 1122, 1126 (Colo. App. 2000). Plaintiff fails to establish each of the elements.

**1.      Plaintiff Cannot Show That The Individual Defendants Engaged In Extreme and Outrageous Conduct.**

Whether a defendant's conduct was outrageous is first for the Court to decide. Schackelford v. Courtesy Ford, Inc., 96 F. Supp. 2d 1140, 1146 (D. Colo. 2000). If reasonable men could not disagree on, defendants are entitled to judgment as a matter of law. Coors Brewing Co. v. Floyd, 978 P.2d 663, 665-66 (Colo. 1999).  For an employer's actions to constitute outrageous conduct, the acts must be

> so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.  Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Rugg v. McCarty, 476 P.2d 753, 756 (Colo. 1970). "[L]iability...does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Schackelford, 96 F. Supp. 2d at 1146. "The level of outrageousness required for conduct to create liability for intentional infliction of emotional distress is extremely high." Ain v. Unum Life Ins. Co. of America, 2009 WL 5126536, at *4 (D. Colo. 2009) (Slip Copy) (Ex. V). "Language from the Restatement of Torts emphasizes the limited nature of this tort: 'It has not been enough that the defendant acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." Id. (citing Restatement (Second) of Torts § 46, cmt d.).

Here, Plaintiff alleges that the facts set forth in support of his other claims for relief are the same grounds for his outrageous conduct claim. (See Am. Compl. ¶¶ 104-108.) As a matter of law, this is not outrageous conduct. As set forth above, Plaintiff's other claims (for harassment, discrimination and retaliation) fail as a matter of law. In Flowers, the court held that where allegations do not rise to the level of actionable harassment, they "necessarily do not rise to the more exacting standard of outrageous conduct." 2008 WL 185699 at *4 (emphasis added).

Much worse conduct than that alleged by the Plaintiff here has been held insufficient to state a claim for outrageous conduct as a matter of law. For example, in Coors, supra, the Colorado Supreme Court concluded as a matter of law that an employer's alleged conduct of instructing its employee to conduct an illegal undercover narcotics investigation, laundering money to fund an investigation, and firing the employee as a scapegoat to cover up the involvement in criminal activity was not sufficiently outrageous.  978 P.2d at 666; Hounton v. Gallup Indep. Co., 113 Fed. Appx. 329, 334 (10th Cir. 2004) (unpublished) (applying New

Mexico law and holding that screaming at an employee, calling him a "lazy ass," and making him cry was not sufficiently outrageous); McCarty v. Kaiser-Hill Co., L.L.C., 15 P.3d 1122, 1126-27 (Colo. App. 2000) (claim that supervisors sought to drive plaintiff out of his employment through a pattern of intimidation and harassment including threatening phone calls and physical intimidation in the form of vehicular assaults was not sufficiently outrageous).

### 2.   Plaintiff Cannot Establish The Individual Defendants Acted Recklessly or Intended to Cause Plaintiff Severe Emotional Distress.

Even if Plaintiff could demonstrate that the Individual Defendants acted outrageously as a matter of law, he cannot demonstrate that they engaged in such conduct recklessly or with intent to cause Plaintiff severe emotional distress. "A person acts with intent to cause severe emotional distress when he engages in conduct with the purpose of causing several emotional distress to another person, or he knows that his conduct is certain or substantially certain to have that result." Culpepper v. Pearl Street Bldg., Inc., 877 P.2d 877, 882 (Colo. 1994). "A person acts recklessly in causing severe emotional distress in another if, at the time of the conduct, he knew or reasonably should have known that there was a substantial probability that his conduct would cause severe emotional distress to the other person." Id. at 882-83. "Just being an insensitive churl. . . does not give rise to liability." Price v. Fed. Express Corp., 660 F.Supp. 1388, 1396 (D. Colo. 1987).  None of the Individual Defendants intended to cause Plaintiff severe emotional harm, and Plaintiff has no evidence to the contrary.

### 3.   Finally, Plaintiff Cannot Establish That He Suffered Severe Emotional Distress.

Severe emotional distress is defined as distress which is "so severe that no reasonable man could be expected to endure it."  Restatement (Second) Torts § 46 cmt. j (1965). Plaintiff's deposition testimony actually refutes that Plaintiff suffered any emotional distress whatsoever,

much less severe emotional distress. In his deposition, Plaintiff testified that he has not seen a doctor or any health care provider for emotional distress, he has not looked into any low or no-cost health care providers, nor has he received any type of diagnosis from any mental health provider for any distress. SOF ¶¶ 188-89. Plaintiff has neither received a diagnosis related to what is occurring in his life right now psychologically, nor received any diagnosis regarding the effect of his termination on his mental state. SOF ¶ 189.  Plaintiff's lack of medical concern or treatment for his alleged emotional distress shows that he does not have, and in fact could not have, the severe emotional distress required by this claim.   Accordingly, summary judgment should enter in favor of the Individual Defendants.

## CONCLUSION

For the foregoing reasons, Defendants Xcel Energy Services Inc. and Jack Dybalski respectfully request that the Court grant summary judgment in their favor and against Plaintiff.

DATED this 1st day of March, 2010.

*s/ Leah P. VanLandschoot*
Leah P. VanLandschoot
BROWNSTEIN HYATT FARBER SCHRECK, LLP
410 17th Street, 22nd Floor
Denver, Colorado 80202
Phone:  (303) 223-1100
Fax:  (303) 223-1111
e-mail: lvanlandschoot@bhfs.com

Meghan W. Martinez
Barkley Martinez, P.C.
14426 East Evans Avenue
Aurora, Colorado 80014-1474
Phone: (303) 302-7977
Fax: (303) 759-5203
e-mail: martinez@barmarlaw.com

ATTORNEYS FOR DEFENDANTS
XCEL ENERGY SERVICES INC. and
JACK DYBALSKI

## <u>CERTIFICATE OF MAILING</u>

The undersigned hereby certifies that on this 1st day of March, 2010, a true and correct copy of the foregoing **DEFENDANTS XCEL ENERGY SERVICES INC. AND JACK DYBALSKI'S MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** was filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

tjm@18thavelaw.com

jjester@jgllp.com

skelly@s-d.com

martinez@barmarlaw.com

s/ Linda R. Kerman
Linda R. Kerman